**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CHARLYN THOMAS,                                    Index No.

                                    Plaintiff,

            vs.

                                                   **VERIFIED COMPLAINT**

GLOBAL FERTILITY AND GENETICS, INC.,               *PLAINTIFF DEMANDS*
GLOBAL FERTILITY AND GENETICS NEW YORK             *A TRIAL BY JURY*
LLC., KJD MEDICAL, PLLC,
DR. MELVIN THORNTON,  HUEBSCHER AND CO.,
and ERIC HUEBSCHER.

                                    Defendants.

Plaintiff, Charlyn Thomas, by and through her Attorney, Omobolaji Oluwasola, Esq., as and for

her Verified Complaint against Defendants Global Fertility and Genetics, Inc., Global Fertility and

Genetics New York LLC., KJD Medical, PLLC, Dr. Melvin Thornton, Huebscher and Co., and

Eric Huebscher, states and alleges as follows:

## PARTIES

1.      Plaintiff Charlyn Thomas ("Ms. Thomas") is a resident of Brooklyn, New York.

2.      Upon information and belief, at all times relevant herein, Defendant Global Fertility

and Genetics, Inc. ("GFG" or "The Company") is a Delaware Corporation with a place of business

at 115 E 57th St., Suites 420-430, New York, NY 10022.

3.      Upon information and belief, at all times relevant herein, Defendant Global Fertility

and Genetics New York LLC is a Delaware Corporation with a place of business at 115 E 57th St.,

Suites 420-430, New York, NY 10022.

4.      Upon information and belief, at all times relevant herein, KJD Medical, PLLC

("KJD") is a Delaware Corporation with a place of business at 115 E 57th St., Suites 420-430, New

York, NY 10022.

5.      Upon information and belief, at all times relevant herein, Defendant Dr. Melvin Thornton II ("Dr. Thornton") was and is a resident of the State of Connecticut.

6.      Upon information and belief, at all times relevant herein, Defendant Huebscher & Co. is a New York Corporation with a place of business at 301 East 87th Street, Suite 20E, New York, NY 10128.

7.      Upon information and belief, at all times relevant herein, Defendant Eric Huebscher, President of Huebscher & Co., was and is a resident of the County of New York, and State of New York.

## JURISDICTION AND VENUE

8.      Jurisdiction of this Court is proper under Title VII of the Civil Rights Act of 1964, *§42 U.S.C. 2000e-3(a), 42 U.S.C. §§ 2000e-5(f)(3),* and the Americans with Disabilities Act *42 U.S. Code § 12117* as it arises under the laws of the United States and is an action to recover damages or to secure equitable or other relief under an Act of Congress providing for the protection of civil rights.

9.      The Court has supplemental jurisdiction over Plaintiff's claims brought under state and city law pursuant to *28 U.S.C. §1367.*

10.      Venue is proper in this district in that a substantial part of the events or omissions giving rise to the claim occurred within the Southern District of the State of New York. *28 U.S.C. § 1391(b).*

## FACTUAL ALLEGATIONS

### *The Parties*

11.      Professionally, Ms. Thomas is an Embryologist who takes immense pride in her work. Ms. Thomas has worked in her field for over 12 years. Ms. Thomas graduated from CUNY,

Medgar Evers College with a Bachelor of Science in Biology in 2010. Personally, Ms. Thomas is a loving single mother of a twelve-year-old son, and a devoted older sister committed to serving as a surrogate for her younger sister who, painfully, can no longer conceive children. She is also a woman whose Christian faith motivates her to continually strive to always do the right thing, even in the face of opposition.

12.     Defendant Global Fertility and Genetics, Inc. ("GFG" or "The Company") is an in vitro fertilization ("IVF"), egg freezing, egg donation, and surrogacy center located in New York, New York.

13.     According to GFG's website, the Company's stated philosophy is "[w]hen you walk through our doors, you're not just a patient, you are part of our family." *See* Ex. A, GFG Website.

14.     GFG prides itself on its "personalized patient care" through its "customized fertility solutions help[ing] patients around the world through state-of-the-art technology, decades of experience and extensive research in IVF, egg freezing, egg donation and surrogacy." *Id.*

15.     GFG also prides itself on being "ethical" stating, "[w]e respect each patient's personal and medical requirements, as well as their ethical, religious, and lifestyle needs.  Whether you are an intended parent, egg donor, sperm donor, or a gestational carrier, we've got your back!" *Id.*

16.     Defendant Dr. Melvin Thornton II is the new "Proprietor and Medical Director of (the new) Global Fertility and Genetics, Inc." that emerged from bankruptcy. *Ex. B*., GFG's Website. Dr. Thornton is double board-certified in Obstetrics and Gynecology and Reproductive Medicine. He is also a member of the American College of Obstetrics and Gynecology and The American Society of Reproductive Medicine. *Id*. Dr. Thornton has practiced medicine for over 25

years, and serves as a committee member of the American Society of Reproductive Medicine ("ASRM"). *Id.*

17.     Defendant KJD Fertility, PPLC ("KJD") has a business relationship with GFG. KJD is the entity that issued Ms. Thomas' paychecks during the tenure of her employment with GFG and KJD. From here on out, GFG and KJD are collectively referred to as "GFG" or "the new GFG."

18.     Huebscher & Co. is a financial and management consulting company that advises GFG. *See* Ex. C. Huebscher & Co. Website Home Page. Huebscher & Co also served as an advisor to the bankruptcy trustee of the former GFG that went bankrupt.

19.     Defendant Eric Huebscher ("Mr. Huebscher") is the President of Huebscher & Co.. He is a Certified Professional Compliance Officer (CPCO) with over 30 years of management experience with a specialized emphasis on healthcare operations, finance and regulatory compliance and oversight. *See* Ex. D., Screenshot of Huebscher & Co. Website.

20.     Upon information and belief, the U.S. Bankruptcy Court for the Southern District of New York appointed Mr. Huebscher as the Chapter 11 trustee of the former Global Fertility and Genetics ("the old GFG") on April 4, 2024.

21.     Upon information and belief, the Bankruptcy court authorized Mr. Huebscher, as the GFG Chapter 11 trustee, to employ and retain Huebscher & Co. as his financial advisor on June 20, 2024.

22.     Upon information and belief, the professional services rendered by Huebscher & Co. included financial analysis, review and feasibility of a plan of reorganization and assisting with the review of tax return matters and such other tasks as requested by the trustee. However, Huebscher and Co.'s services extended beyond these matters as explained below.

23.     Upon information and belief, Mr. Huebscher ceased to be Chapter 11 trustee on December 4, 2024, which was the date that the confirmed plan of reorganization of the new GFG became effective. In other words, the date GFG emerged from bankruptcy.

24.     Upon information and belief, at that time, all of the creditors of GFG with allowed claims received payment of 100% of the amount of their claims in cash.

25.     Additionally, Huebscher & Co.'s official work as the trustee's financial advisor terminated on December 4, 2024, the effective date of the GFG plan, the same date that Mr. Huebscher's trusteeship ended.

26.     According to GFG's website, GFG came under the ownership and management as the new Proprietor and Medical Director in November 2024.

27.     This newly formed GFG ("GFG") is the Defendant that is named as a Defendant in this verified complaint, not the formerly bankrupt GFG given that the retaliation, breach of contract, and other claims accrued well after GFG emerged from bankruptcy.

28.     Upon information and belief, since Mr. Huebscher and Huebscher & Co. (collectively "the Huebscher Defendants") remained actively involved in GFG's governance and affairs well after the trusteeship ended, the Huebscher Defendants effectively became the new GFG's agent and advisor outside of the court appointed bankruptcy trusteeship.

29.     As the new GFG's agent, the Huebscher Defendants had a fiduciary duty to GFG and its employees.

30.     The Huebscher Defendants were actively involved in the governance of GFG and served as the primary liaison between Ms. Thomas and the Company and GFG's spokesperson after GFG wrongfully terminated her employment as an act of retaliation.

31.     Upon information and belief, one of the primary roles of the Huebscher Defendants at GFG was supervision of GFG's payroll.

*Ms. Thomas' Commitment to Excellence*

32.     Ms. Thomas is an Embryologist who takes immense pride in her work. Ms. Thomas has worked in her field for over 12 years. She began her career as a Lab Assistant at Columbia University. Afterwards, Ms. Thomas advanced to Andrology at Neway Fertility. Ms. Thomas then successfully secured a position with GENESIS Fertility and Reproductive Medicine where she worked as an Andrology and Endocrinology Technologist. During the pandemic, Ms. Thomas began working at Shady Grove Fertility as a Senior Andrologist. At Shady Grove, Ms. Thomas was also known for excellent work. Ms. Thomas made it her duty to learn the inner workings of the laboratory operations. Ms. Thomas' work was so phenomenal that she received high commendations from the New York State Inspector who insisted on meeting her due to Shady Grove's high level of organizational excellence, from the documentation of paperwork to the controls, the stellarly updated database, and the smooth functioning of the systems that she implemented in the lab. In January 2022, Ms. Thomas was given the opportunity to advance to Embryology: her dream field. She applied the same mindset of excellence to her work as an Embryologist as she had all of her former roles. Needless to say, Ms. Thomas prides herself on her meticulous work ethic. Further, having worked her way up from the bottom of the Profession, Ms. Thomas takes her role as an Embryologist incredibly seriously.

*Ms. Thomas' Employment Experiences and GFG's Dysfunctional Environment*

33.     On July 14, 2024, Ms. Thomas received an offer of employment from Global Fertility and Genetics, Inc. to work as an Embryologist. *See* Ex. E, Ms. Thomas' Employment Offer Letter.

34.     Ms. Thomas accepted GFG's offer and signed her employment letter on July 15, 2024.

35.     As aforementioned, Ms. Thomas is a woman of integrity who is committed to excelling in her work. As soon as Ms. Thomas was hired, she communicated that she could not "wait to start the journey with the team" and even offered to "come in [early] for a few hours to get a head start and learn [GFG's] EMR." Ex. F,  July 15, 2024 Email to Kendall Smalls.

36.     In that same email, Ms. Thomas asked a critical question about GFG's vacation policies stating, "[i]s sick time separate from the two week vacation time[?] Are there any paid company holidays?" *Id.*

37.     Although Ms. Thomas asked these questions about GFG's policies, she was never provided a Company Handbook throughout her tenure at GFG.

38.     Ms. Thomas was scheduled to begin her employment term as an Embryologist with GFG on August 19, 2024.

39.     On Monday, August 12, 2024, when GFG's Director of Embryology (at the time) requested that she come in to do a procedure for Everie Egg Donation ("Everie"). Everie was an egg donor agency that had a relationship with GFG. Prior to her official employment start date, Ms. Thomas agreed and committed to doing the oocyte freezing and retrieval. *See* Ex. G, August 12, 2025 Email. Even though school also started for Ms. Thomas' son that same day, and Ms. Thomas had a meeting with her son's teacher, Ms. Thomas still made sure to be present to perform the tasks requested of her.

40.     What should have been an exciting new opportunity to serve patients as an Embryologist with GFG quickly turned into an organizational nightmare and toxic work environment.

41.    After her start date finally arrived, Ms. Thomas did not receive any onboarding or training, including training on GFG's Electronic Medical Records systems ("EMR"), or the GFG's business operations and procedures.

42.    Although GFG's Embryologist Tania Vivas who worked at GFG for years and had a wealth of knowledge about GFG's protocols and systems quit her job at GFG, Ms. Vivas later agreed to work part-time remotely assisting GFG with the transportation of gametes and data entry.

43.    When Ms. Thomas began working at GFG, Ms. Vivas was supposed to train Ms. Thomas on work flow and protocols.

44.    Unfortunately, Ms. Thomas was informed by her Supervisor, Embryologist J. Kendall Smalls ("Mr. Smalls"), that Dr. Thornton and Mr. Huebscher insisted on firing Ms. Vivas for reasons unbeknownst to Ms. Thomas.

45.    Although Ms. Thomas requested that Ms. Vivas not be terminated until she was fully trained in her responsibilities so that she could properly handle the transport process, Ms. Thomas' pleas fell on deaf ears.

46.    Ms. Vivas was terminated prematurely, and all of her responsibilities fell on Ms. Thomas as a new hire.

47.    As a result of the foregoing, outside of her immediate supervisor, Mr. Smalls, there was no lab staff when Ms. Thomas began working at GFG.

48.    Thus, Ms. Thomas had to learn a lot of her job requirements and responsibilities at the last minute as they were demanded of her.

49.    GFG's lack of organizational excellence prior to Ms. Thomas' arrival to the Company was only the tip of the iceberg.

50.     Ms. Thomas' introduction to GFG as an official employee included learning that Everie, the egg bank that worked with GFG decided to sever ties with GFG. Upon information and belief, Everie was no longer confident in GFG's ability to freeze donor eggs on Everie's behalf because GFG was not following the proper protocols thereby leading Everie to sever its ties with GFG.

51.     As a result, Ms. Thomas was tasked with the responsibility of removing all of Everie's frozen eggs from GFG's egg storage to another facility of Everie's choice. The final inventory was moved in January 2025.

52.     Prior to Ms. Thomas' arrival, the other embryologists who worked at GFG all quit within weeks of each other leaving GFG with an incredibly immense backlog of paperwork to be scanned and entered electronically.

53.     Needless to say, Ms. Thomas inherited an organizational disaster.

54.     She hoped that her presence and commitment to excellence could help GFG get on the right track. Painfully, reality soon proved otherwise.

55.     Dr. Thornton constantly grew angry about the backlog of paperwork and blamed Ms. Thomas and the other new team members that onboarded after her about these outstanding paperwork issues that existed prior to their employment.

56.     Dr. Thornton's anger manifested as emails to the team explicitly stating that it is upsetting that he did not have information he needed to meet with patients.

57.     Dr. Thornton's expression of anger was inappropriate given the reality that the problems that he complained of existed prior to the onboarding of the new team, and in light of the fact that Dr. Thornton was most likely the root problem of these issues.

58.    As a result of the immense work backlog, during her tenure at GFG, Ms. Thomas often worked extremely long hours. From 14 hour days, back-to-back weekends, and even some of her days off, Ms. Thomas worked tirelessly to bring GFG up to speed.

59.    On most days, Ms. Thomas was the last person to leave the office.

60.    Ms. Thomas tirelessly worked around the clock for GFG, including working remotely unpaid well after standard business hours until the early hours of the next morning in order to complete her then-current workload while also attempting to clean up the backlog that was left by the previous team.

61.    As a salaried employee, Ms. Thomas never earned extra income for her tireless work under arduous conditions.

62.    Ms. Thomas never took any Paid Time Off "PTO". Instead, she worked on her scheduled days off either in office or remotely without compensation to bring the organization up to speed.

63.    With her immense workload, Ms. Thomas was often forced to leave her son at her mother's house so that she could focus on work.

64.    However, in spite of the fact that Ms. Thomas worked 10-12 hours in office and then another 3-4 hours remotely, Dr. Thornton constantly complained about issues that preexisted her employment and other matters that were beyond Ms. Thomas' control.

65.    Although many of the GFG staff reasonably quit due to GFG's toxic work environment, Ms. Thomas remained committed to performing her work with the highest level of excellence for the sake of GFG's patients: individuals hoping that GFG's services would be the answer to their desire for parenthood in some of their most vulnerable moments.

*GFG's Broken Promises: Early Delays of Health Insurance Coverage & A Raise Denial*

66.     In the midst of her attempts to make the best of a rough start at GFG due to the organization's many operational failures, Ms. Thomas had to also wrestle with the challenge of the Company's decision to delay the benefits that it promised her including health insurance and a $10,000 raise.

67.     When Ms. Thomas was offered her position at GFG, she was informed that she would be permitted to opt into their health insurance 30 days after her start date.

68.     After the end of these initial 30 days, Ms. Thomas inquired about enrolling into the Company's insurance plan.

69.     She was told that she actually would not be permitted to do so until 90 days passed.

70.     As a result, Ms. Thomas and her son were denied healthcare coverage by GFG.

71.     Ms. Thomas was relying on having coverage for her son's mandatory annual physical prior to beginning his school year.

72.     As a result of this denial, Ms. Thomas was forced to pay for this visit out-of-pocket to ensure that her son could enroll in school.

73.     Additionally, Ms. Thomas was informed by Mr. Smalls that she would receive a $10,000 raise after her 90 day probation period on November 19, 2024.

74.     After this initial period, Ms. Thomas had a review with Mr. Smalls and GFG's then-Office Manager, Jessica Carrion. Although Mr. Smalls insisted that Ms. Thomas would receive her raise as promised, GFG did not provide Ms. Thomas with her raise until January 11, 2025, two months after her probationary period ended.

75.     Little did Ms. Thomas know, this experience was just a foreshadow of ways that GFG would have other deleterious impacts on her experiences with health insurance.

*A Request For A Closed Door Meeting*

76.    On or about October 26, 2024, merely two months into working at GFG, Ms. Thomas learned that a former GFG employee alleged that "the doc or some big boss wanted to have sex with her" so she decided to resign from her position. *Ex. H*, Message From A Colleague.

77.    Upon information and belief, Ms. Thomas learned that Dr. Thornton, prior to her employment, had a pool party at his house early that summer in which he offered some women swimsuits.

78.    Having never received training on GFG's sexual harassment protocol and not knowing what else to do, Ms. Thomas requested a closed door meeting with Dr. Thornton and Mr. Smalls to bring the allegations to their attention.

79.    Ms. Thomas showed Dr. Thornton and Mr. Smalls a printed copy of the messages that she received from a colleague.

80.    In that meeting, Ms. Thomas informed Dr. Thornton and Mr. Smalls that her previous employer had training and policies regarding preventing and reporting sexual harassment in the office, and advised them that GFG should implement its own version to avoid the type of situation that had recently been brought to her attention.

81.    Dr. Thornton requested that they shred the printed copies of the messages and expressed concern that his wife would discover the messages.

82.    Dr. Thornton sat on Ms. Thomas' feedback for months without addressing her concerns for the need for sexual harassment training for GFG.

83.    Upon information and belief, months later, this information was used to oust Ms. Thomas' former supervisor, Mr. Smalls from the Company.

*Dr. Thornton and GFG's Gross and Willful Negligence and Medical Malpractice*

84.     On GFG's website, the Company boasts that it is "committed to compassionate, ethical and personalized patient care for every intended parent." Ex. A, GFG Website PDF.

85.     However, in Ms. Thomas' experiences, this couldn't be further from the truth.

86.     Instead of offering ethical patient care for every intended parent, GFG is a ticking timebomb rife with willful negligence and malpractice.

87.     All of this disorganization and questionable ethical practices are at the behest of GFG's Medical Director, Dr. Thornton, who willfully cuts corners and breaks standards and protocols involved in patient care behind the scenes in ways that drastically jeopardize health protocols, medical safety standards, and the quality of care that GFG's patients receive.

88.     This disorganization, willful and gross negligence, and medical malpractice are underscored by the fact that when the time arose for GFG's New York State and FDA Inspections for the clinic's licensing, GFG produced manuals with its protocols out of the blue and Ms. Thomas was told to sign them although she had never before seen or received these manuals.

89.     This disorganization, willful and gross negligence, and medical malpractice were made manifest through many other incidents during Ms. Thomas' GFG tenure.

90.     When Ms. Thomas arrived at GFG, it seemed as though the front desk staff were not properly trained on the protocols of dealing with IVF patients or specimen intake.

91.     As a result, one of the things that Ms. Thomas implemented was that every patient label must state the type of procedure that they are coming in for along with their correct legal name, date of birth and date of service.

92.    These are all identifying information to ensure that GFG verified the patient's identity to ensure that they were performing the correct procedure. The procedure should also be verified by what they were scheduled for and the requisition.

93.    This was not happening, so Ms. Thomas constantly found errors either as she prepared to do a procedure (semen analysis, semen cryo, egg retrieval), or after the fact, especially if she was not at work the day prior.

94.    Similarly, Ms. Thomas experienced other examples where the chain of custody for specimens was continually broken during the drawing of blood whereas best practices require verifying the patient's identity prior to drawing blood, showing the patient the tube, and then handing the blood or any other specimen brought into the lab directly to another person instead of leaving it somewhere—which is what was occurring at GFG.

95.    On or about September 2024, a patient was scheduled to have an Intrauterine Insemination ("IUI"). However, her donor sperm was not physically in the lab.

96.    According to ASRM standard procedures, when a patient comes to begin her cycle, her donor sperm should be ordered. When the sperm is ordered, the clinic must verify the sperm data to ensure that the sperm bank didn't make a mistake.

97.    Ms. Thomas' job was to verify that this is the sperm that is expected for the patient.

98.    Ms. Thomas notified Dr. Thornton that the patient was to have an IUI, but there was no donor sperm.

99.    She informed Dr. Thornton that they should not start her on her medication for her cycle to prepare her for the IUI if her donor sperm is not present in the clinic. Again, this is standard procedure.

100.    However, Dr. Thornton responded angrily, "Do not tell me and the clinical team what we should and shouldn't do."

101.    Ms. Thomas reported this incident to her supervisor Mr. Smalls.

102.    As one of GFG's Embryologists, Ms. Thomas was responsible for coordinating the transportation of donor and autologous gametes, including eggs, embryos, and sperm, to and from the clinic.

103.    Ms. Thomas' role included several standard guidelines that are in place when transferring specimens, some of which include federal and state rules. *See* Ex. I, ASRM guidelines.

104.    For example, all documentation must be accurate and verified before accepting specimen.

105.    These documents include, but are not limited to, the following: the tissue bank license, signed consent forms, information regarding the number of gametes to be transferred and type of gamete, infectious disease blood work taken with 1 year of the specimen being created, FDA testing for donor gametes, summary of records for donor gametes, Clinical Laboratory Improvement Amendments ("CLIA") license, FDA license, the date of freeze, and more.

106.    All consent forms must be signed by the parties to whom the gametes belong, either the autologous parties or the donor.

107.    Consent forms must be signed via Docusign, in the presence of a notary or in person by a lab staff with valid identification.

108.    Unfortunately, on several occasions, Dr. Thornton requested that Ms. Thomas bypass these health requirements in order to expedite the process thereby insisting that she break protocols and the standards associated with the medical profession which in turn posed a health safety risk to patients.

109. Dr. Thornton's repeated requests would have required Ms. Thomas to violate her training as an Embryologist and thereby posed a risk to her professional reputation, but also to patient safety and care had she complied with these unethical requests.

110. Beyond risking Ms. Thomas' professional reputation, Dr. Thornton's repeated requests posed a medical hazard to the health and safety of his patients thereby constituting medical malpractice.

111. For example, GFG has numerous international patients from China, Japan and Korea (collectively "Internationals").

112. GFG has special liaisons to help bridge the gap between GFG and the clinics in these locations. It was standard that the gametes would be created at these clinics and then sent to GFG to perform biopsy on them or culture them to Day 7 of embryo development.

113. More often than not, there was a lot of missing paperwork or incorrectly filled out paperwork with signatures improperly made in pencil instead of any of the three approved methods to verify the validity of the signatures. Thus, Ms. Thomas had no way of knowing for sure if the consent forms were signed by the actual patients.

114. Further, the forms were often emailed as pictures instead of scans as required.

115. Ms. Thomas refused to accept these inappropriately completed forms for the sake of patient safety.

116. Dr. Thornton informed Ms. Thomas that they do not have notaries in these places.

117. However, instead of finding a viable solution to this problem that would allow GFG and Ms. Thomas to abide by the proper protocol and procedures required by Ms. Thomas' training, Dr. Thornton complained to Mr. Smalls that Ms. Thomas was holding up the transportation

process. Thus, Dr. Thornton prioritized this false sense of efficiency at the expense of medical excellence, health, and safety.

118.    Though Dr. Thornton complained about Ms. Thomas' refusal to capitulate to his demands, Ms. Thomas was simply trying to honor her training and the standards of the practice by abiding by the protocol when completing her tasks instead of cutting corners for the sake of "efficiency" that could be disastrous for the health and safety of the clinic and patients in the long run.

119.    Dr. Thornton's insistence that Ms. Thomas break protocol and violate the best standards was an ongoing issue since October 2024 when Ms. Thomas started doing gamete transportation.

120.    On or about December 2024, when patients J. I. and E,V., a male patient and his wife, wanted to transport his sperm from his previous clinic to GFG to continue treatment.

121.    As the male patient, he was the legal owner of the gamete.

122.    Ms. Thomas reviewed the process with him and sent him the consent forms via Docusign to the email address that he provided.

123.    After the initial correspondence, the patient's wife was the only one communicating with Ms. Thomas.

124.    Ms. Thomas raised concerns about the lack of correspondence with the male patient, as his email was supposed to be secure, and Ms. Thomas could not ensure that the consents were actually being signed by the male patient as the legal owner of the gamete.

125.     Dr. Thornton complained to Mr. Smalls that Ms. Thomas was being "too strict" simply for trying to abide by her training and the protocols that all Embryologists are expected to follow for the sake of patient health and safety.

126.    Ms. Thomas responded that she was uncomfortable signing off on those consent forms, so Dr. Thornton signed off on the forms as the witness that the signatures were correct and verified.

127.    Regarding the handling of semen, Ms. Thomas tried to implement the proper protocols for the sake of patient health and safety that when a male patient produces a semen sample, his information should be verified prior to him providing the sample, his ID should be checked every time he came to produce a sample, and that all paperwork must be filled out fully and accurately and that he must sign where applicable.

128.    Additionally, Ms. Thomas advocated that no semen samples should be left unattended because when she arrived at GFG, there was a box that the patients would put the sample in and then leave the room which was a break in chain of custody. Ms. Thomas raised this issue to her supervisor, Ms. Andrea Westerlund's, attention. With her permission, Ms. Thomas sent an email stating that this should no longer happen. However, another supervisor immediately replied rebutting what she said demonstrating the lack of care at GFG.

129.    Here, breaking the chain of custody especially with semen samples is problematic because a sample can be tampered with, a patient can later say that they're not sure if the sample was theirs (which can only be verified through a DNA test down the line), amongst other things as the room that it was left in is not a secured area. Breaking the chain of custody poses a hazard to patient safety and health.

130.    The front desk staff was also responsible for making patient labels needed to prep the patients charts which was done the day prior. They would constantly give the labels to the lab late which would delay Ms. Thomas in prepping the charts and therefore staying way over time.

131.    When Ms. Thomas asked if this can be done sooner, it was not received well and she was in turn called a "dark cloud" as she was requesting things that was never requested before her employment there.

132.    Due to improper protocols and procedures in the handling of gametes at GFG, There was an incident where a GFG employee was freezing oocytes and there were both MIIs(mature oocytes) and MIs(immature oocytes). Ms. Thomas assisted her by preparing and labeling the straws for her, but the GFG employee somehow ended up mixing up the two sets of oocytes(from the same patient), and had to thaw the straws that she had already frozen in order to distinguish which were the mature ones and which were the immature ones (something that can only be seen under a microscope). Mature oocytes have a polar body and immature ones do not. Ms. Thomas helped her remake the straws and assisted with the paperwork.

133.    Another example of GFG's willingness to break health standards and safety protocols is demonstrated in the handling of oocyte cryopreservation. Oocyte cryopreservation is time sensitive. Oocytes are to be stripped within two hours of being retrieved and frozen within 3 hours of being retrieved. However, this was often not the case at GFG due to organizational disfunction.

134.    Out of an effort to avoid errors like this which posed a risk to patient health and safety, Ms. Thomas insisted that GFG follow proper protocols and procedures in the handling of gametes.

135.    On or about January 2025, Ms. Thomas was packing up a patient's embryos for transport to another clinic with GFG's Lab Administrator Karen Vergara ("Ms. Vergara").

136.    The proper processes and protocol for gamete transportation require that two people verify that the information labeled on the freezing device is accurate and matches the documentation for the sake of patient health and safety.

137.    Ms. Thomas was in the midst of completing this process with Ms. Vergara when Dr. Thornton interrupted Ms. Thomas and Ms. Vergara to request information from her about a semen analysis that was scheduled for that same day.

138.    Dr. Thornton insisted that he immediately receive the results of the semen analysis. However, at that point, the patient had not arrived to provide the semen sample.

139.    Further, Ms. Thomas was in the midst of following her training to meticulously verify the embryos that she was in the process of packing. Not wanting to make a mistake in the gamete packaging process, Ms. Thomas informed Dr. Thornton that as soon as the patient produces the sample and it liquifies, she would perform the semen analysis and give him the results.

140.    Dr. Thornton returned two or three times because a front desk employee mistakenly scheduled the semen analysis at the same time as Dr. Thornton's consultation with the patient and the patient's partner.

141.    Dr. Thornton wanted to review the results with the patient and his partner. However, this was not possible because the semen intake was never completed.

142.    Ms. Thomas explained that while she understood the dilemma, she had embryos in an open bucket with nitrogen and she could not responsibly leave them in the open unattended which would have violated the health and safety standards of her discipline.

143.    Further, the semen sample had not yet liquified and therefore the analysis wouldn't be as accurate as possible according to guidelines for process semen issued by the World Health Organization ("the WHO"). *See* Ex. J, WHO Guidelines.

144.    Dr. Thornton grew upset with Ms. Thomas refusal to abandon the embryos that she was packing.

145.    As a result, Dr. Thornton complained again to Ms. Thomas' supervisors Mr. Smalls and Andrea Westerlund ("Ms. Westerlund").

146.    Even though Dr. Thornton complained to Ms. Westerlund about Ms. Thomas' refusal to abandon properly packing the embryos at his request. It is, in fact, Ms. Thomas' excellence at caring for embryos that led Ms. Westerlund to praise Ms. Thomas, stating "[I'm] emailing you in case I forget to mention it…I thawed an embryo the other day and it was so beautiful it made us ask "who froze?" and it was YOU! Excellent job :)." *Ex. K*, Message from Ms. Westerlund.

147.    On this or another occasion when Ms. Thomas did not stop what she was doing to fulfill Dr. Thornton's because she wanted to protect the patients' gametes,  Ms. Westerlund told Ms. Thomas "I know that you're right but you don't want to cut your nose to spite your face". She then reminded Ms. Thomas that at the end of the day, Dr. Thornton was the boss and she needed to do whatever he said."

148.    Later that week, Ms. Thomas requested a meeting with Mr. Smalls and Ms. Shantai Rivera-Bonilla, GFG's Practice Director, in which she informed them that Dr. Thornton's continued insistence that she break training and protocol to capitulate to his negligence could not lawfully continue as she was unwilling to jeopardize patient care, health and safety standards, and the integrity of her work as an Embryologist to appease Dr. Thornton.

149.    This matter persisted between Ms. Thomas and Dr. Thornton throughout Ms. Thomas' entire tenure at Global.

150.    Dr. Thornton, the head of the practice and clinical team, constantly expressed frustration with Ms. Thomas and challenged her when she asked for proper documentation and clear and concise communication on the directives given to the lab.

151.    Dr. Thornton also refused to provide a trigger list: a standard document used in IVF clinics that provides the lab with the list of patients that would be having procedures the following day. A trigger list typically includes matters such as the time of trigger(injection), date of procedure, type of procedure, patient's name and treatment plan.

152.    These trigger lists assure that the medical professionals and patients are all aligned as there is typical no communication between the patients and the lab. Thus, the clinical team is the bridge between what the patient wants and what was discussed and how it is to be executed in the lab. The trigger list is sent the day before the procedures which allows the lab professionals to accurately prepare for the procedures by making sure that there is adequate staffing, and materials needed for that day. Providing this trigger list is essential to patient health and the safety standards of the practice.

153.    Upon attempting to do inventory of GFG's frozen gametes stored on site, Ms. Thomas often discovered several errors as in name discrepancies, missing paperwork, inconsistencies in cryopreservation information such as date of freeze, number of gametes frozen, day of culture etc.

154.    Another point of contention between Ms. Thomas and Dr. Thornton was the persistent problem that Dr. Thornton would constantly schedule patients to have their semen frozen without having their infectious disease testing prior to freezing which was a violation of patient health and the safety standards of the practice.

155.    Infectious disease testing is mandatory for all gametes that will be frozen as a matter of patient health and safety standards.

156.    It is imperative that the medical professionals know whether the patient is positive for any diseases, information which determines where the specimen is stored as a matter of patient health and safety standards.

157.    Dr. Thornton's willful and gross negligence exemplified by his decision to schedule patients for semen freezing without infectious disease testing presented an issue as time continued because GFG did not have the proper storage to separate these specimens until they received the results.

158.    Ms. Thomas relayed this several times to her superiors as well as Dr. Thornton. However, she was constantly negatively criticized and challenged on this issue.

159.    Due to her insistence that she follow proper protocols and procedures for the sake of health and safety in her duties, Ms. Thomas was labeled a "dark cloud." Upon information and belief, these negative criticisms about Ms. Thomas were written down via email, texts, or other written transmission.

160.    Other examples of Dr. Thornton's and GFG's willful and gross negligence included incidents involving the incorrect number of embryos to be thawed written on the thaw requisition.

161.    For example, the paperwork that was given to the lab would indicate that the patient wants one embryo thawed and then on the day of the procedure, at the last minute it was changed to two.

162.    Dr. Thornton unwillingness to write enough required identifying information (including the date of the freeze, embryo number, culture date of embryo, embryo grade and

genetic testing result if applicable) about the embryo to be thawed on the requisition caused confusion in the lab.

163.    Further, last minute changes to the patient care plan without proper notification to the lab or not given in a timely manner. For example, whether to perform ICSI or not, or whether to perform biopsy or not.

164.    On one occasion, Ms. Thomas' supervisor started the biopsy process on a patient's embryo.  Ms. Thomas double-checked her email and noticed that the patient no longer wanted her embryos biopsied.

165.    Proper protocol and best standards required the care plan to be written prior to the cycle starting and that any last minute changes had to be communicated both verbally and written.

166.    In another incident, the patient had a lot of embryos biopsied. However, at the last minute, Ms. Thomas was told that the patient did not want all of the embryos sent out for testing.

167.    Ms. Thomas often urged the doctor and the rest of the clinical team that these last minute changes can cause errors in the lab and that they should try to minimize those risks as much as possible for the sake of patient care and health.

168.    In spite of her attempts to work follow her training and the proper protocol, Dr. Thornton also often blamed Ms. Thomas and even sent emails complaining about matters that occurred prior to her employment at GFG.

169.    Dr. Thornton also blamed Ms. Thomas, Mr. Smalls, and the other Embryologists for his low pregnancy rates for donor patients. However, when GFG Embryologists did a comparative analysis of Dr. Thornton's pregnancy rates compared to that of Dr. Meir Olcha, who had his own separate practice but used GFG's labs and Embryologists as resources for his practice to store and transfer gametes, they found that Dr. Olcha had a much higher pregnancy rate amongst

his patients. Dr. Olcha had his own team of nurses. Here, the common denominator for Dr. Thornton's low pregnancy rate as compared to Dr. Olcha seemed to be the doctor's themselves. In this case, it was most likely a result of Dr. Thornton's gross negligence in patient care.

170.    As a result, Ms. Thomas experienced a hostile work environment.

171.    On another occasion, there was an incident in which Dr. Thornton wanted to know the inventory of some donor gametes that were stored at GFG that a patient intended to use.

172.    Ms. Thomas could not locate any information on the gametes. Dr. Thornton became upset when she relayed that information to him.

173.    There was no proper documentation that should've accompanied the gametes when they were transferred into the clinic both electronically and physically.

174.    Upon information and belief, these gametes came from CT Fertility where Dr. Thornton previously worked and were transported into Global Fertility years prior to her employment at GFG.

175.    Dr. Thornton requested the information immediately. However, it was impossible to do so given the improper documentation.

176.    After a few days, GFG's lab assistant and Ms. Thomas were able to extensively search the storage tank to locate the gametes that Dr. Thornton needed.

177.    Although they attempted as best as possible to complete a physical inventory and document their findings as accurately as possible, there were still numerous discrepancies discovered and missing paperwork that couldn't be reconciled like summary of records, infectious disease blood work, etc.

178.   Again, Dr. Thornton frequently expected Ms. Thomas to drop whatever she was doing to attend to his requests thereby running the risk of violating health and safety standards of the practice.

179.   Ms. Thomas reported Dr. Thornton's inappropriate requests to her immediate supervisor J. Kendall Smalls.

180.   She informed Mr. Smalls that if she was in the middle of handling lab work, she would not risk making a crucial mistake by not properly finishing what she was doing.

181.   GFG was a hostile work environment for Ms. Thomas because she always followed protocol for the sake of excellence in upholding patient care and wanted everyone to do the same.

182.   Ms. Thomas' refusal to capitulate to Dr. Thornton's inappropriate demands to break protocol and violate her training as to the standards for an embryologist caused tension between Ms. Thomas and Dr. Thornton.

183.   Dr. Thornton did not like Ms. Thomas' commitment to honor her training and the ethical standards of her profession through her refusal to break protocol.

184.   Mr. Huebscher played an integral role in the dysfunction at GFG. Although Mr. Huebscher specializes in compliance, instead of helping GFG comply with the standards for the proper care of gametes. Mr. Huebscher aided in the disorganization.

185.   Often, when Dr. Thornton issued his meritless complaints to Ms. Thomas to compromise her work standards, he would email his complaint to Mr. Huebscher who would then step in to email the team to pressure them to break protocol at Dr. Thornton's behest for the sake of the Company's false sense of efficiency.

186.   Instead of holding Dr. Thornton accountable, Mr. Huebscher pandered to and supported Dr. Thornton's problematic demands.

187.    However, Ms. Thomas refused to give into this pressure from Dr. Thornton and Mr. Huebscher.

188.    Ms. Thomas' refusal to break protocol is rooted in her deep understanding that mistakes in her line of work could not just be costly, but disastrous for parents seeking to conceive and their unborn children.

189.    On or about late January 2025, during one of GFG's weekly meetings to discuss upcoming cases, Ms. Thomas raised the importance of GFG having a trigger list and used an FET(Frozen Embryo Transfer), as an example.

190.    Many GFG staff were present at this meeting including Dr. Thornton, Mr. Huebscher, Ms. Westerlund, another Embryologist Nurgul Yilmaz, Ms. Carrion, GFG's Clinical Manager Maria Vergel, and the Practice Director, Shantai Rivera-Bonilla.

191.    During the meeting, Ms. Thomas explained that while GFG may have the requisition a month prior to the FET, the trigger list given the day prior is the final confirmation that this patient's procedure is still happening.

192.    Dr. Thornton pushed back on Ms. Thomas' request insisting that it was too much paperwork for him and his team. However, Ms. Thomas continued to reiterate her concerns and that not having final confirmation leaves the door open for errors. She gave him the example that if the patient changed their mind, or didn't pass their lining check etc., then that would prevent them from thawing an embryo unnecessarily and then having to refreeze that embryo.

193.    This is of the utmost importance because there is a chance that an embryo will not survive once thawed and Ms. Thomas wanted to minimize having to handle that embryo if they did not need to do so.

194.    Ms. Thomas explained to Dr. Thornton that a month in advance is too long and big of a window to not have a final confirmation closer to the procedure.

195.    Mr. Huebscher was a vocal participant in this meeting.

196.    Two weeks later, on February 7, 2025, Ms. Thomas was called into the office of her immediate supervisor Mr. Smalls. Mr. Smalls informed her that, at Dr. Thornton request, GFG decided to terminate her position.

197.    Ms. Thomas' employment offer letter states, "Global Fertility & Genetics reserves the right to terminate the employment of any employee for just cause at any time without notice and without payment in lieu of notice. Global Fertility & Genetics will be entitled to terminate your employment for any reason other than for just cause, upon providing to you such minimum notice of 30 days as required by law." *Ex. E*, Ms. Thomas' Employment Offer Letter.

198.    Ms. Thomas was terminated from GFG on February 7, 2025 without just cause. As a result, GFG breached the termination provision of its contract with Ms. Thomas.

*The High Stakes of ASRM Standards*

199.    A little over one week after GFG wrongfully terminated Ms. Thomas, NBC news broke a story on Krystena Murray, a 38-year-old White wedding photographer from Savannah, Georgia who gave birth to an African-American baby due to a fertility clinic's mistake. *See* Ex. L, NBC News Story on Krystena Murray.

200.    After enduring two challenging rounds of in vitro fertilization including multiple daily injections, blood draws, and nausea, the first embryo transfer proved unsuccessful. The second IVF process was successful.

201.    Ms. Murray carried the baby full term only to give birth to another couple's embryo. After five months of raising the baby that she carried and birthed from her womb, she gave the baby to his biological parents. *Id.* She ultimately sued the clinic.

202.    On March 19, 2025, a little over one month after GFG wrongfully terminated Ms. Thomas for insisting on high standards for The Company, NBC News published another story entitled, "After IVF Nightmares, Patients Have Few Protections." The NBC news analysis "found hundreds of lawsuits over five years alleging that embryos were lost, destroyed or swapped by fertility clinics or companies." *Ex. M*, NBC News Article.

203.    Take Marissa Calhoun, a woman who was diagnosed with severe endometriosis causing pregnancy difficulties. By the age of 35, she finished three painful egg retrievals. 16 of her eggs were successfully fertilized, but she learned days later that "a laboratory employee had failed to label her embryos before placing them in an incubator, then threw the unlabeled embryos away." *Id*.

204.    The NBC News' analysis "identified 82 lawsuits related to allegations of human error, like Calhoun's, from 2019 to 2024, and 13 over swapped embryos, eggs or sperm." *Id.*

205.    In light of stories like Ms. Murray and Ms. Calhoun's, it would seem that GFG should have praised and supported Ms. Thomas for her insistence on the excellent stewardship of gametes in order to avoid human error.

206.    Instead, she was wrongfully penalized and terminated. GFG's meticulous nature was seen as an obstruction to Dr. Thornton's problematic demands and impatience at the expense of accuracy. A reality that could cause long-term devastation to the health and wellbeing patients who could potentially be negatively impacted by the mistakes that Ms. Thomas sought to both avoid and address in her work.

29

*Discrimination Against Women, Internationals, & Persons with Disabilities*

207.    Many of GFG's patients are women who have decided to undergo egg freezing as a means of maintaining the viability of the pursuit of motherhood without having to forego pursuing their careers.

208.    Federal Courts have previously recognized that women may state a claim of sex discrimination under Title VII of the Civil Rights Act of 1964 for claims related to infertility, specifically the gender-specific quality of childbearing capacity.

209.    The Defendants failed follow the proper protocols involved in the handling of gametes belonging to these women thereby treating them unfairly. In other words, they discriminated against these women.

210.    As aforementioned, many of GFG's patients are also of international origin who have decided to undergo egg freezing as a means of maintaining the viability of the pursuit of parenthood with GFG.

211.    The Defendants failed follow the proper protocols involved in the handling of gametes belonging to these internationals thereby treating them unfairly. In other words, they discriminated against these international patients.

212.    In reporting the Defendants' refusal to honor her training as an Embryologist by insisting that she violate protocol, Ms. Thomas sought to protect women and internationals pursuing IVF services.

213.    Here, the Defendants' decision to retaliate against Ms. Thomas simply for honoring her training as an embryologist constitutes retaliation in violation of Title VII of the Civil Rights Act of 1964.

214.    Upon information and belief, many GFG's patient population include persons, men and women alike, who have made the decision to pursue IVF services as a means of preserving their fertility while experiencing serious medical diagnoses such as cancer.

215.    Federal courts have previously recognized infertility as a disability under the ADA.

216.    Federal courts have also previously held that claims related to IVF services can be pursued under the ADA.

217.    The Defendants failed follow the proper protocols involved in the handling of gametes belonging to these patients facing disabilities.

218.    As a result, the Defendants discriminated against these persons with disabilities.

219.    In reporting the Defendants' refusal to honor her training as an Embryologist by insisting that she violate protocol, Ms. Thomas sought to protect disabled persons pursuing IVF services.

220.    Here, the Defendants' decision to retaliate against Ms. Thomas simply for honoring her training as an embryologist constitutes retaliation in violation of the American with Disabilities Act.

*Dr. Thornton's Gross Negligence*

221.    To add insult to injury, Dr. Thornton is well aware of the potential harm that IVF errors could cause to his clients.

222.    Dr. Thornton and his former clinic, CT Fertility, were previously sued for implanting the wrong embryo in a woman according to 2019 news articles. *See* Ex. N

223.    Thus, Dr. Thornton is well aware of the potential harm that IVF errors could cause to his clients.

224.    As a medical doctor, Dr. Thornton, upon information and belief, took a Physician's

Pledge. The Physicians prayer typically reads (in part) as follows:

> I recognize that the practice of medicine is a privilege with which comes considerable responsibility and I will not abuse my position.

> I will practice medicine with integrity, humility, honesty, and compassion—working with my fellow doctors and other colleagues to meet the needs of my patients.

> I shall never intentionally do or administer anything to the overall harm of my patients.

> I will not permit considerations of gender, race, religion, political affiliation, sexual orientation, nationality, or social standing to influence my duty of care.

> I will oppose policies in breach of human rights and will not participate in them.

Ex. O.

225.    Upon information and belief, Dr. Thornton signs agreements with his clients

pertaining to medical ethics and patient care.

226.    GFG's website outlines GFG and Dr. Thornton's stated commitment to patient

care. *See* Exs. A & B.

227.    Dr. Thornton's requirement that Ms. Thomas' violate the standards of

Embryologist regarding gamete care is a breach of all of the aforementioned duties.

228.    Dr. Thornton's insistence that Ms. Thomas' violate the standards of Embryologist

regarding gamete care also poses a serious health threat to the safety of patients.

229.    In light of Dr. Thornton's past law suit and his duties to both his patients and his

medical care team as the head of the lab, Dr. Thornton's actions towards Ms. Thomas can be

characterized as nothing other than gross negligence.

230.    However, in spite of having been sued for the very mistake that Ms. Thomas was trying to avoid in her meticulous work ethic, Dr. Thornton wrongfully terminated her.

*The Impact of Dr. Thornton's Toxicity on Ms. Thomas' Health*

231.    Ms. Thomas literally carried the toxicity of GFG's work culture in her body. Ms. Thomas had several fibroids in her uterus during the time of her employment at GFG.

232.    During her tenure at GFG, Ms. Thomas's abdominal discomfort grew and she was constantly in pain.

233.    She learned that her fibroid metastasized rapidly.

234.    Upon information and belief, the growth of uterine fibroids may be intensified by the presence of stress. *See Ex. P*, NIH Articles on Fibroids; *see also* Ex. Q, NIH Article on Fibroids.

235.    Thus, GFG's toxic work culture took a toll on Ms. Thomas' physical and mental health.

236.    Her doctors insisted that she have surgery to remove the fibroids. Ms. Thomas' fibroids were beyond alarming to her because she volunteered to serve as a surrogate for her young sister who is tragically no longer able to carry her own children.

237.    Ms. Thomas was scheduled to have an abdominal myomectomy and left ovarian cystectomy on March 25, 2025.

238.    On April 7, 2025, Samantha Piwniczuk, the Patient Care Coordinator from Maiden Lane Medical, PLLC sent Ms. Thomas images of just some of the fibroids that were removed from her uterus. *See* Ex. R and below:



4/7/25, 9:23 AM    Mail - Samantha Pwniozuk - Outlook

https://outlook.office.com/mail/inbox/id/AAQkAGI2ZTIyMTk2LTNhZmMtNGMyYS1hMmIxLWI0NDY0NDkxMzE2MgAQAEHcCV8o4tHsL8AOPZjKm/%3...    1/1

*GFG And Eric Huebscher's Early  Termination of Ms. Thomas' Insurance and Failure to Provide Ms. Thomas a Termination Letter*

239.    As aforementioned, Mr. Huebscher ceased to be Chapter 11 trustee on December 4, 2024 which was the date that the confirmed plan of reorganization of GFG became effective.

240.    Additionally, Huebscher & Co.'s official work as the trustee's financial advisor terminated on December 4, 2024, the effective date of the GFG plan, the same date that Mr. Huebscher's trusteeship ended.

241.    However, Mr. Huebscher and Huebscher & Co. remained actively involved in GFG's governance and affairs well after the trusteeship ended.

242.    Here, the Huebscher Defendants effectively became the new GFG's agent.

34

243.    As GFG's agent, the Huebscher Defendants may be held liable for GFG's violations of the New York City Human Rights Law and other laws in the same way that GFG may be held liable.

244.    Under *N.Y. Labor Law §195(6),* employers and their agents are required to provide discharged employees with written notice stating the effective date of termination and the exact date that any employee benefits, including health, accident, and life insurance, will cease.

245.    Under *N.Y. Labor Law §195(6)*, GFG and its agents were required to issue this written termination notice no later than  five days after the date of termination by law. N.Y. Labor Law § 195(6).

246.    Under *N.Y. Labor Law §195(6)*, failure to notify an employee of cancellation of accident or health insurance subjects an employer and its agents to an additional penalty pursuant to section two hundred seventeen of New York's labor law.

247.    GFG, KJD, Dr. Thornton and the Huebscher Defendants never provided Ms. Thomas with a written termination notice outlining the dates that her employee benefits would terminate.

248.    12 N.Y.C.R.R. § 472.8 requires all employers and their agents to provide notice, at the time of separation, of the employee's right to file an application for unemployment benefits to be provided on Form IA 12.3.

249.    In violation of 12 N.Y.C.R.R. §472.8, GFG and GFG's business consultant and agent Mr. Huebscher, President of Huebscher & Co. never provided Ms. Thomas with notice, at the time of her termination, of her right to file an application for unemployment benefits to be provided on Form IA 12.3.

250.    Under N.Y. Labor Law § 195(6), New York employers and their agents are required to provide written vacation or PTO policies and therefore should clearly set forth in writing their philosophy in respect to unused vacation.

251.    Under New York law, in the absence of a forfeiture clause in an employer's written policy, accrued and unused vacation must be paid to employees upon termination.

252.    Upon information and belief, at the time of her termination, Ms. Thomas had accrued about $2,500 in PTO. Ms. Thomas was also entitled to be paid for two unused comp days.

253.    Neither GFG nor the Huebscher Defendants paid Ms. Thomas her accrued and unused vacation or PTO payments.

254.    Further, during her employment tenure, GFG never provided Ms. Thomas with its written vacation or PTO policies setting forth their philosophy in respect to unused vacation. Ms. Thomas only first received GFG's employment handbook on March 5, 2025 after her termination when she requested it from a former co-worker. *See* Ex. S,  Email from former co-worker.

255.    Ms. Thomas' paystubs from January 2025 and February 2025 demonstrate that health insurance payments were deducted from her paychecks.

256.    However, in spite of having paid insurance premiums in full for January 2025 and February 2025, Ms. Thomas' insurance coverage was terminated on February 7, 2025, the same date of her termination from GFG.

257.    On or about February 10, 2025, Ms. Thomas' surgeon's office called her to inform her that she no longer had health insurance.

258.    On February 19, 2025, Ms. Thomas reached out to Ms. Westerlund requesting a dated termination letter, information for COBRA, and requesting to be paid for PTO and comp time. *See* Ex. T.

259.    On February 19, 2025 Ms. Thomas also reached out to Shantai Bonilla stating that insurance premiums were deducted from her payroll and asking GFG to inform her of the date of her insurance coverage because she had an upcoming procedure and cannot have a lapse in coverage. In this correspondence, she attached her employment letter and her paystub demonstrating that money was deducted from her payroll for her insurance. *See* Ex. T.

260.    Ms. Bonilla's response was that she "reviewed all with Eric [Huebscher] and he said he will be in touch." *See Id.* Here, upon information and belief, the Huebscher Defendants remained in charge of payroll through February.

261.    As the entities in charge of GFG's payroll, the Huebscher Defendants were not only aware at all times that Ms. Thomas' insurance had been prematurely cut off, they were also aware that this would have a negative impact on her then pending surgery.

262.    Although Ms. Thomas never reached out to the Huebscher Defendants about this matter, on February 19, 2025, the Huebscher Defendants took it upon themselves to intervene and respond to Ms. Thomas' inquiries as GFG's agent.

263.    On February 19, 2025, Ms. Thomas received an email from the Huebscher Defendants stating she would receive a COBRA notice in March, that she would not receive a letter of termination, and that GFG does not pay for accrued PTO or "comp time". *See* Ex. T.

264.    On February 19, 2025, Ms. Thomas responded to Mr. Huebscher's email respectfully requesting an explanation as to why she would not be receiving her accrued PTO or an official termination letter. *See Id.*

265.    On February 19, 2025, Ms. Thomas received a letter from Paychex stating that she lost insurance coverage on February 7, 2025 due to termination. *See* Ex. U, Paychex Letter to Charlyn Thomas.

266.    On February 27, 2025, Ms. Thomas emailed the Huebscher Defendants and Ms. Shantai Bonilla to notify them that her insurance was terminated on February 7, 2025 with no notice from GFG. *See* Ex. V, Ms. Thomas' February 27, 2025 Email.

267.    Ms. Thomas also notified the Huebscher Defendants and Ms. Bonilla that insurance premiums were deducted from her paychecks for the entire month of January and from her last paycheck in February. *See* Ex. W.

268.    Ms. Thomas requested that the Huebscher Defendants and Ms. Bonilla explain why her insurance was terminated when she already paid for coverage and requested a refund for the amount of money deducted for the insurance premiums. *See Ex. V.*

269.    Neither the Huebscher Defendants, Ms. Bonilla, or even Dr. Thornton responded to Ms. Thomas' email dated February 27, 2025. *Id.*

270.    Ms. Thomas followed up with the Huebscher Defendants and Dr. Thornton on February 28, 2025 respectfully requesting an explanation to help her understand why her health insurance was terminated on February 7, 2025 in spite of the fact that insurance premiums were deducted from her January and February paychecks. *See Id.*

271.    At that point, Ms. Thomas had received her February 19, 2025 paycheck which included an additional deduction for her health insurance. Ms. Thomas also requested clarification on the period covered by her insurance premium payments. *See Id.*

272.    Ms. Thomas attempted to call United Health Care to discover more information related to her insurance coverage. However, she was instructed that since she was insured under an employer plan, and they could not release that information to her.

273.    On February 28, 2025, the Huebscher Defendants responded to Ms. Thomas' email simply stating, "Paychex team Please respond". *See* Ex. T.

274. On March 12, 2025, Ms. Thomas emailed the Huebscher Defendants and Dr. Thornton to request that GFG provide her with a formal termination letter and her outstanding PTO as well as to inform him that her insurance coverage was terminated on February 7, 2025. *See* Ex. X.

275. On March 12, 2025, the Huebscher Defendants, in violation of New York Law, explicitly stated that Ms. Thomas would not receive a termination letter. *Id.*

276. That same day, Ms. Thomas reiterated her request for a formal termination letter explicitly stating "The absence of this standard documentation is hindering my ability to access certain benefits and services, such as those available through New York State. I would appreciate an explanation for the decision not to provide this letter, and any supporting legal justification." *Id.*

277. Neither the Huebscher Defendants nor Dr. Thornton responded to Ms. Thomas' email and GFG never provided her with a written termination notice as required by law.

278. The Huebscher Defendants, as GFG's agents, became responsible, as a result of their intervention, for navigating the early termination of Ms. Thomas' insurance benefits. However, the Huebscher Defendants with gross negligence and/or recklessly refused to ensure that Ms. Thomas' insurance coverage was reinstated thereby assisting in the early and unlawful termination of Ms. Thomas' insurance benefits. Upon information, this refusal to reinstate Ms. Thomas' insurance coverage was done with actual malice.

279. Ms. Thomas did not qualify for Medicaid. However, she was able to secure health insurance with New York State Insurance Health First. Still, Ms. Thomas' surgeon did not accept Health First.

280.    As a result, Ms. Thomas was left with no choice but to pay $9,080 for her surgery out of pocket. On March 12, 2025, Ms. Thomas used her credit card to pay a medical bill of $580 out-of-pocket. *See* Ex. Y, Ms. Thomas' Pre-opt surgery receipt. And on or about March 19, 2025, Ms. Thomas used her credit card to pay $8,500 out-of-pocket to Dr. Rachel Barr for her necessary surgery. *See* Ex. Z, Ms. Thomas' Surgery receipt.

281.    Ms. Thomas' expected medical costs with insurance should cost no more than $2,000-$3,000, meaning Ms. Thomas paid three to four times more than expected due to GFG's decision to abruptly terminate her health insurance. *See Id.*

*The Huebscher Defendants' Gross Negligence and Breach of Fiduciary Duties*

282.    As aforementioned, the U.S. Bankruptcy Court for the Southern District of New York appointed Mr. Huebscher as the Chapter 11 trustee of the former Global Fertility and Genetics ("the old GFG") on April 4, 2024.

283.    The Bankruptcy court authorized Mr. Huebscher as the GFG Chapter 11 trustee, to employ and retain Huebscher & Co as his financial advisor on June 20, 2024.

284.    The professional services rendered by Huebscher & Co included financial analysis, review and feasibility of a plan of reorganization and assisting with the review of tax return matters and such other tasks as requested by the trustee.

285.    Upon information and belief, the Huebscher Defendants began to manage and oversee GFG's payroll on or about November 13, 2024 after an incident in which GFG failed to pay its staff on an expected payroll date. An email was sent to GFG employees stating Mr. Huebscher would be handling payroll moving forward.

286.    As aforementioned, Mr. Huebscher ceased to be Chapter 11 trustee on December 4, 2024 which was the date that the confirmed plan of reorganization of GFG became effective.

287.    Additionally, Huebscher & Co.'s official work as the trustee's financial advisor terminated on December 4, 2024, the effective date of the GFG plan, the same date that Mr. Huebscher's trusteeship ended.

288.    However, the Huebscher Defendants remained actively involved in GFG's governance and affairs well after the trusteeship ended.

289.    Here, the Huebscher Defendants effectively became the new GFG's agent.

290.    The Huebscher Defendants decision to remain actively involved in GFG's governance after the official end of the court-appointed trusteeship inherently meant that they exceeded their scope of duties as Bankruptcy Trustee.

291.    The Huebscher Defendants role in GFG's governance even extended to communications concerning the handling of gametes.

292.    Upon information and belief, at one point during Ms. Thomas' tenure at GFG, Mr. Huebscher sent an email to Mr. Smalls requesting information pertaining to the delay of certain gametes, and Mr. Smalls and Ms. Thomas responded explaining the nature of the delay.

293.    Upon information and belief, Mr. Huebscher has no medical training or training as an Embryologist, and yet he was intimately involved in GFG's medical affairs and the Company's overall operations.

294.    At other times, employees at the front desk had to run information by Mr. Huebscher.

295.    Mr. Huebscher was so intimately involved in GFG's governance that the Company postponed meetings when Mr. Huebscher could not be present.

296.    Mr. Huebscher was present at meetings where Ms. Thomas courageously sought to held Dr. Thornton accountable for sloppy work that fell below the standards of medical professionals and sought to pressure her to violate her professional training as an embryologist.

297.    Upon information and belief, the Huebscher Defendants were intimately involved and aided and abetted in the decision to retaliate against Ms. Thomas by wrongfully terminating her.

298.    As GFG's agent, the Huebscher Defendants may be held liable for GFG's violations of the New York City Human Rights Law and other laws in the same way that GFG may be held liable.

299.    During Mr. Huebscher's tenure as the old GFG's Bankruptcy Trustee, Mr. Huebscher was entitled to qualified immunity from lawsuits for personal liability for acts taken as a matter of business judgment in acting in accordance with statutory or other duty or pursuant to court order.

300.    However, as Bankruptcy Trustee, Mr. Huebscher could be held personally liable for knowing, intentional and/or negligent breaches of his fiduciary duties or where he acts in bad faith.

301.    During the Huebscher Defendants February and March email exchanges with Ms. Thomas concerning her termination letter and the early termination of her insurance benefits, the Huebscher Defendants were no longer court appointed trustees, but rather they were agents of the new GFG.

302.    As GFG's agents, the Huebscher Defendants, had a fiduciary duty of care to GFG, and by extension, Ms. Thomas as an employee of GFG.

303.    As GFG's agents, the Huebscher Defendants violated New York law in refusing to provide her with a termination letter, failing to provide her notice of her right to file an application for unemployment benefits, failing to inform Ms. Thomas of the cancellation of her benefits, and assisting in the early termination of her insurance benefits in refusing to ensure that they were reinstated after having been informed that she lost insurance access.

304.    The Huebscher Defendants cannot dispute that they violated New York law. However, Mr. Huebscher maintains that he cannot be sued because he was formerly appointed the old GFG's Bankruptcy Trustee by the Court.

305.    Here, it is apparent that the Huebscher Defendants felt emboldened to violate New York law in regards to the handling of Ms. Thomas' termination as a result of the false belief that they could not be held liable for their actions.

306.    Thus, the Huebscher Defendants violation of New York law was intentional, reckless, and done solely in bad faith.

307.    The Huebscher Defendants willful violation of New York Law under the auspices that they cannot sued because Mr. Huebscher was originally appointed as GFG's Bankruptcy trustee is an abuse of Mr. Huebscher's position and power as an agent of the court.

308.    Here, the Huebscher Defendants false belief that they were above the law and could not be held accountable is incredibly problematic and implies that Trustees can indiscriminately abuse their power.

309.    Bankruptcy trustees are appointed by the Court to monitor the conduct of bankruptcy parties and private estates trustees to ensure compliance with applicable laws and procedures.

310.    Given his position and power as an administrator appointed by the court to oversee the execution of the old GFG's bankruptcy plan, the Huebscher Defendants' role in the retaliation and wrongful termination of Ms. Thomas, as well as the Huebscher Defendants' decision to violate New York law in navigating Ms. Thomas' employment relationship and termination with GFG is grossly negligent and a particularly egregious form of tortious interference with a contract and tortious interference with a business relationship.

*EEOC Charges & Right to Sue Letters*

311.    Ms. Thomas filed a charge against GFG with the EEOC on May 30, 2025. The charge number is 520-2025-05938. The EEOC issued a right to sue letter against Defendant GFG on July 11, 2025. *See* Ex. AA.

312.    Ms. Thomas filed a charge against Defendant Huebscher and Co. with the EEOC on May 30, 2025. The charge number is 520-2025-05939. The EEOC issued a right to sue letter against Defendant Huebscher and Co on July 11, 2025. *See Id.*

313.    Ms. Thomas filed a charge against Defendant KJD Medical, PLLC with the EEOC on May 30, 2025. The charge number is 520-2025-05940. The EEOC issued a right to sue letter against Defendant KJD Medical, PLLC on July 11, 2025. *See Id.*

**AS AND FOR A FIRST CAUSE OF ACTION**
**AGAINST ALL DEFENDANTS**
*Retaliation Under Title VII of the Civil Rights Act of 1964*

314.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

315.    GFG and KJD employed Ms. Thomas during the aforementioned events giving rise to this verified complaint.

316.    Title VII applies to employers and their agents.

317.    The Huebscher Defendants are GFG and KJD's agents and were intimately involved in the retaliation and wrongful termination of Ms. Thomas.

318.    Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000e-2(a)(1) provides, in pertinent part, that:

> It shall be an unlawful employment practice for an employer to… discharge any individual, or otherwise to discriminate against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religions, sex, or national origin.

319.    This Claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section(s) 2000e et seq., as amended, for relief based upon the unlawful employment practices of the above-named Defendant.

320.    Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e-3(a) provides that it shall be unlawful employment practice for an employer: "(1) to . . . discriminate against any of his employees . . . because she has opposed any practice made an unlawful employment practice by this subchapter, or because she has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

321.    Among other discriminatory comments and conduct, Defendants retaliated against Plaintiff in violations of Title VII's prohibition against discrimination in employment based, in whole or in part, upon employee's decision to oppose discrimination against women and people of International origin.

322.    Many of GFG's patients are women who have decided to undergo egg freezing as a means of maintaining the viability of the pursuit of motherhood without having to forego pursuing their careers.

323.     Federal Courts have previously recognized that women may state a claim of sex discrimination under Title VII of the Civil Rights Act of 1964 for claims related to infertility, specifically the gender-specific quality of childbearing capacity.

324.     The Defendants failed follow the proper protocols involved in the handling of gametes belonging to these women thereby treating them unfairly. In other words, they discriminated against these women.

325.     Upon information and belief,  many of GFG's patients are internationals who have decided to undergo egg freezing as a means of maintaining the viability of the pursuit of parenthood with GFG.

326.     The Defendants failed follow the proper protocols involved in the handling of gametes belonging to these internationals thereby treating them unfairly. In other words, they discriminated against these international patients.

327.     As a result, the Defendants discriminated against these Internationals.

328.     In reporting the Defendants' refusal to honor her training as an Embryologist by insisting that she violate protocol, Ms. Thomas sought to protect women and internationals pursuing IVF services.

329.     Here, the Defendants' decision to retaliate against Ms. Thomas simply for honoring her training as an embryologist constitutes retaliation in violation of Title VII of the Civil Rights Act of 1964.

330.     Defendants Dr. Thornton and Global Fertility and Genetics, Inc., engaged in unlawful employment practices prohibited by 42 U.S.C. 2000e seq. by discriminating against Plaintiff with respect to the terms, conditions or privileges of employment because of Plaintiff's

opposition to the unlawful employment practices of Defendants impacting women and persons of international origin.

331.    Upon information and belief, the Huebscher Defendants, as GFG's agents, were at all times involved in GFG's governance, including the decision to retaliate against Ms. Thomas.

332.    The Defendants violated the above and Plaintiff suffered numerous damages as a result.

## AS AND FOR A SECOND CAUSE OF ACTION
## AGAINST ALL DEFENDANTS

*Retaliation Under the Americans With Disabilities Act (42 U.S. Code § 12101)*

333.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

334.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

335.    GFG and KJD employed Ms. Thomas during the aforementioned events giving rise to this verified complaint.

336.    Title VII applies to employers and their agents.

337.    The Huebscher Defendants are GFG and KJD's agents and were intimately involved in the retaliation and wrongful termination of Ms. Thomas.

338.    *42 U.S. Code § 12101(a)(1)* and *(3)*  states that Congress found that

physical or mental disabilities in no way diminish a person's right to fully participate in all aspects of society, yet many people with physical or mental disabilities have been precluded from doing so because of discrimination; others who have a record of a <u>disability or are regarded as having a disability also have been subjected to discrimination; historically, society has tended to isolate</u> and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem; and discrimination against individuals with disabilities persists in such critical areas as …, health services…and access to public services;

339.    *42 U.S. Code § 12117* states:

The powers, remedies, and procedures set forth in sections 2000e–4, 2000e–5, 2000e–6, 2000e–8, and 2000e–9 of this title shall be the powers, remedies, and procedures this subchapter provides to…any person alleging discrimination on the basis of disability in violation of any provision of this chapter, or regulations promulgated under section 12116 of this title, concerning employment.

340.    *42 U.S. Code § 2000e–5* states, The Commission is empowered, as hereinafter provided, to prevent any person from engaging in any unlawful employment practice as set forth in section 2000e–2 or 2000e–3 of this title.

341.    *42 U.S.C. 2000e-3(a)* provides that it shall be unlawful employment practice for an employer: "(1) to . . . discriminate against any of his employees . . . because she has opposed any practice made an unlawful employment practice by this subchapter, or because she has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

342.    Defendants Dr. Thornton and Global Fertility and Genetics, Inc., engaged in unlawful employment practices prohibited by 42 U.S.C. 2000e seq. by discriminating against Plaintiff with respect to the terms, conditions or privileges of employment because of Plaintiff's opposition to the unlawful employment practices of Defendants.

343.    Upon information and belief, many GFG's patient population include persons, men and women alike, who have made the decision to pursue IVF services as a means of preserving their fertility while experiencing serious medical diagnoses such as cancer.

344.    Federal courts have previously held that claims related to IVF services can be pursued under the ADA.

345.    Federal courts have also recognized infertility as a form of disability under the ADA.

346.    The Defendants failed follow the proper protocols involved in the handling of gametes belonging to these patients facing disabilities.

347.    As a result, the Defendants discriminated against these persons with disabilities.

348.    In reporting the Defendants' refusal to honor her training as an Embryologist by insisting that she violate protocol, Ms. Thomas sought to disabled persons.

349.    Here, the Defendants' decision to retaliate against Ms. Thomas simply for honoring her training as an embryologist constitutes retaliation in violation of Title VII.

350.    Upon information and belief, the Huebscher Defendants, as GFG's agents, were at all times involved in GFG's governance, including the decision to wrongfully terminate Ms. Thomas.

351.    The Defendants violated the above and Plaintiff suffered numerous damages as a result.

<div align="center">

**AS AND FOR A THIRD CAUSE OF ACTION**
**AGAINST ALL DEFENDANTS**
*Retaliation Under New York Labor Law §740 (2)*

</div>

352.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

353.    GFG and KJD employed Ms. Thomas during the aforementioned events giving rise to this verified complaint.

354.    New York Labor Laws applies to employers and their agents.

355.    The Huebscher Defendants are GFG and KJD's agents and were intimately involved in the retaliation and wrongful termination of Ms. Thomas.

356.    *New York Labor Law §740 (2)* provides that

> An employer shall not take any retaliatory action against an employee, whether or not within the scope of the employee's job duties, because such

<div align="center">49</div>

employee….(a) discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that the employee reasonably believes is in violation of law, rule or regulation or that the employee reasonably believes poses a substantial and specific danger to the public health or safety….[or]  (c) objects to, or refuses to participate in any such activity, policy or practice.

357.    Defendants Dr. Thornton and Global Fertility and Genetics, Inc., engaged in unlawful employment practices prohibited by *New York Labor Law §740 (2)* by terminating Plaintiff because of Plaintiff's opposition to Defendants' practices that posed a substantial and specific danger to the public health and safety.

358.    Specifically, the Defendants' willingness to violate proper procedures and protocols in the handling and storage of gametes, as outlined above, posed a substantial and specific danger to the public health and safety, specifically to GFG's patients.

359.    Upon information and belief, the Huebscher Defendants, as GFG's agents, were at all times involved in GFG's governance, including the decision to wrongfully terminate Ms. Thomas.

360.    The Defendants violated the above and Plaintiff suffered numerous damages as a result.

### AS AND FOR A FOURTH CAUSE OF ACTION
### AGAINST ALL DEFENDANTS
*Retaliation Under New York State Executive Law §296(7)*

361.    Plaintiff repeats and realleges each and every allegation contained in the above paragraphs of this Complaint.

362.    GFG and KJD employed Ms. Thomas during the aforementioned events giving rise to this verified complaint.

363.    The New York City Human Rights Law applies to employers and their agents.

364.    The Huebscher Defendants are GFG and KJD's agents.

365.    *New York State Executive Law §296(7)* provides that it shall be an unlawful discriminatory practice: "For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he has opposed any practices forbidden under this article."

366.    Ms. Thomas had a reasonable belief that Dr. Thornton's actions constituted a violation of her Embryologist training and professional standards of practice. She also had and maintains a good faith belief that Dr. Thornton's actions posed a risk to the health and welfare of GFG's patients.

367.    Ms. Thomas voiced her concerns about Dr. Thornton's violation of medical practice standards to her supervisors Mr. Smalls and Ms. Westerlund.

368.    Dr. Thornton and Mr. Huebscher were aware of this protected conduct.

369.    Defendants engaged in an unlawful discriminatory practice by retaliating, terminating, and otherwise discriminating against Plaintiff with respect to the terms, conditions or privileges of employment because of Plaintiff's opposition to the unlawful practices of Defendants.

370.    Plaintiff makes a claim against Defendants under all of the applicable paragraphs of *New York State Executive Law §296.*

371.    Defendants violated the above and Plaintiff suffered numerous damages as a result.

### AS AND FOR A FIFTH CAUSE OF ACTION
### AGAINST ALL DEFENDANTS
*Aiding and Abetting Under New York State Executive Law §296(6)*

372.    Plaintiff repeats and realleges each and every allegation contained in the above paragraphs of this Complaint.

373.    *New York State Executive Law §296(6)* further provides that "It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so."

374.    As outlined above, Defendants engaged in an unlawful discriminatory practice by aiding, abetting, compelling and/or coercing the unlawful, discriminatory, and retaliatory conduct as stated herein.

375.    Plaintiff makes a claim against Defendants under all of the applicable paragraphs of New York State Executive Law §296.

376.    Defendants violated the above and Plaintiff suffered numerous damages as a result.

### AS AND FOR A SIXTH CAUSE OF ACTION
### AGAINST ALL DEFENDANTS
*Retaliation Under The New York City Administrative Code Title 8, §8-107(1) (e)*

377.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

378.    GFG and KJD employed Ms. Thomas during the aforementioned events giving rise to this verified complaint.

379.    The New York City Human Rights Law applies to employers and their agents.

380.    The Huebscher Defendants are GFG and KJD's agents.

381.    The *New York City Administrative Code Title 8, §8-107(1) (e)* provides that it shall be unlawful discriminatory practice: "For an employer . . . to discharge . . . or otherwise discriminate against any person because such person has opposed any practices forbidden under this chapter. . ."

382.    As outlined above, Each of the Defendants engaged in an unlawful discriminatory practice in violation of *New York City Administrative Code Tide 8, §8-107(1)(e)* by discriminating

against the Plaintiff because of Plaintiff's opposition to the unlawful employment practices of Plaintiff's employer.

383.    Plaintiff hereby makes a claim against Defendants under all of the applicable paragraphs of *New York State City Administrative Code Title 8*.

384.    Defendants violated the above and Plaintiff suffered numerous damages as a result.

<div align="center">

**AS AND FOR A SEVENTH CAUSE OF ACTION**
**AGAINST ALL DEFENDANTS**
*Aiding and Abetting Under The New York City Administrative Code Title 8, §8-107(6)*

</div>

385.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

386.    The New York City Human Rights Law applies to employers and their agents.

387.    The *New York City Administrative Code Title 8, §8-107(6)* provides that it shall be unlawful discriminatory practice: "For any person to aid, abet, incite, compel; or coerce the doing of any of the acts forbidden under this chapter, or attempt to do so."

388.    Defendants engaged in an unlawful discriminatory practice in violation of *New York City Administrative Code Title 8, §8-107(6)* by aiding, abetting, inciting, compelling, and coercing the above discriminatory, unlawful, and retaliatory conduct.

389.    Plaintiff hereby makes a claim against Defendants under all of the applicable paragraphs of *New York City Administrative Code Title 8*.

390.    Defendants violated the above and Plaintiff suffered numerous damages as a result.

<div align="center">

**AS AND FOR AN EIGHTH CAUSE OF ACTION**
**AGAINST ALL DEFENDANTS**
*Interference Under The New York City Administrative Code Title 8, §8-107(1) (e)*

</div>

391.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

392.    The New York City Human Rights Law applies to employers and their agents.

393.    *New York City Administrative Code Title 8-107(19)* Interference with protected rights states, in relevant part: It shall be an unlawful discriminatory practice for any person to coerce, intimidate, threaten or interfere with, or attempt to coerce, intimidate, threaten or interfere with, any person in the exercise or enjoyment of, or on account of his or his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected pursuant to this section.

394.    As outlined above, Defendants violated the section cited herein as set forth.

395.    Defendants violated the above and Plaintiff suffered numerous damages as a result.

### AS AND FOR A NINTH CAUSE OF ACTION
### AGAINST ALL DEFENDANTS
*Supervisor Liability Under The New York City Administrative Code Title 8-107(13)*

396.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

397.    The New York City Human Rights Law applies to employers and their agents.

398.    *New York City Administrative Code Title 8-107(13)* entitled Employer liability for discriminatory conduct by employee, agent or independent contractor provides:

> a. An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of any provision of this section other than subdivisions one and two of this section.

> b. An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of subdivision one or two of this section only where: The employee or agent exercised managerial or supervisory responsibility; or the employer knew of the employee's or agent's discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action; an employer shall be deemed to have knowledge of an employee's or agent's discriminatory conduct where that conduct was known by another employee or agent who exercised managerial or

54

supervisory responsibility; or the employer should have known of the employee's or agents discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct.

399.     Defendants violated the above and Plaintiff suffered numerous damages as a result.

<div align="center">

**AS AND FOR A TENTH CAUSE OF ACTION**
**AGAINST ALL DEFENDANTS**
*Gross Negligence*

</div>

400.     Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

401.     As the primary Physician at GFG, Dr. Thornton has a duty to act ethically towards Ms. Thomas and his patients.

402.     Dr. Thornton's duty towards Ms. Thomas included ensuring a safe environment for her to perform her job in a manner that ensured that she was able to abide by the protocols, procedures, and standards required by her training an embryologist.

403.     Dr. Thornton breached this duty when he intentionally and repeatedly deviated from accepted community standards of practice required of physicians, embryologists, and fertility clinic professionals regarding the handling of gametes as well as the proper protocol for their transportation and storage as well as the guidelines required for proper documentation.

404.     Not only did Dr. Thornton intentionally deviate from these standard protocols and procedures, he repeatedly insisted that Ms. Thomas deviate from the protocols and procedures required by her training.

405.     Dr. Thornton penalized Ms. Thomas when she refused to capitulate to his demands to break protocol and violate her training and the standards required for embryologist by reporting her to her supervisors.

406.     Dr. Thornton's breach of his duties was reckless and intentional.

407.    Dr. Thornton has previously been sued for implanting the wrong embryo in a woman, so Dr. Thornton's actions are without excuse.

408.    Dr. Thornton's breach of his duties towards Ms. Thomas and his deviation from the accepted community standards of practice was the proximate cause of Ms. Thomas' injuries because they led to her termination.

409.    The Huebscher Defendants were agents of the new GFG and Ms. Thomas by extension.

410.    The Huebscher Defendants, as GFG's agents, had a duty to GFG and Ms. Thomas by extension, to abide by the law.

411.    The Huebscher Defendants and GFG breached their duty to Ms. Thomas in their violation of New York law in refusing to provide her with a termination letter, failing to provide her notice of her right to file an application for unemployment benefits, failing to inform Ms. Thomas of the cancellation of her benefits, and assisting in the early termination of her insurance benefits in refusing to ensure that they were reinstated after having been informed that she lost insurance access.

412.    The Huebscher Defendants' actions were intentional and reckless thereby constituting gross negligence.

413.    Defendants violated the above and Plaintiff suffered numerous damages as a result.

**AS AND FOR AN ELEVENTH CAUSE OF ACTION**
**AGAINST DR. MELVIN THORNTON AND GLOBAL FERTILITY AND GENETICS, INC.**
*Medical Malpractice*

414.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

415.    As the primary Physician at GFG, Dr. Thornton had a duty to act ethically towards Ms. Thomas and his patients.

416.    Dr. Thornton's duty towards Ms. Thomas included ensuring a safe environment for her to perform her job in a manner that ensured that she was able to abide by the protocols, procedures, and standards required by her training an embryologist.

417.    Dr. Thornton breached this duty when he intentionally and repeatedly deviated from accepted community standards of practice required of physicians, embryologists, and fertility clinic professionals regarding the handling of gametes as well as the proper protocol for their transportation and storage as well as the guidelines required for proper documentation.

418.    Not only did Dr. Thornton intentionally deviate from these standard protocols and procedures, he repeatedly insisted that Ms. Thomas deviate from the protocols and procedures required by her training.

419.    Dr. Thornton penalized Ms. Thomas when she refused to capitulate to his demands to break protocol and violate her training and the standards required for embryologist by reporting her to her supervisors.

420.    Dr. Thornton's breach of his duties towards Ms. Thomas and his deviation from the accepted community standards of practice was the proximate cause of Ms. Thomas' injuries because they led to her termination.

421.    Defendants violated the above and Plaintiff suffered numerous damages as a result.

### AS AND FOR A TWELFTH CAUSE OF ACTION
### AGAINST ALL DEFENDANTS
*Negligence*

422.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

423.    As the primary Physician at GFG, Dr. Thornton had a duty to act ethically towards Ms. Thomas and his patients.

424.    Dr. Thornton's duty towards Ms. Thomas included ensuring a safe environment for her to perform her job in a manner that ensured that she was able to abide by the protocols, procedures, and standards required by her training an embryologist.

425.    Dr. Thornton breached this duty when he intentionally and repeatedly deviated from accepted community standards of practice required of physicians, embryologists, and fertility clinic professionals regarding the handling of gametes as well as the proper protocol for their transportation and storage as well as the guidelines required for proper documentation.

426.    Not only did Dr. Thornton intentionally deviate from these standard protocols and procedures, he repeatedly insisted that Ms. Thomas deviate from the protocols and procedures required by her training.

427.    Dr. Thornton penalized Ms. Thomas when she refused to capitulate to his demands to break protocol and violate her training and the standards required for embryologist by reporting her to her supervisors.

428.    Dr. Thornton was negligent in his repeated failures to exercise the care that a reasonably prudent physician would exercise in his interactions with Ms. Thomas, specifically his demands that she violate her protocol and training.

429.    The Huebscher Defendants were agents of the new GFG and Ms. Thomas by extension.

430.    The Huebscher Defendants, as GFG's agents, had a duty to GFG and Ms. Thomas by extension, to abide by the law.

431.    The Huebscher Defendants and GFG breached their duty to Ms. Thomas in their violation of New York law in refusing to provide her with a termination letter, failing to provide her notice of her right to file an application for unemployment benefits, failing to inform Ms. Thomas of the cancellation of her benefits, and assisting in the early termination of her insurance benefits in refusing to ensure that they were reinstated after having been informed that she lost insurance access.

432.    Defendants violated the above and Plaintiff suffered numerous damages as a result.

**AS AND FOR A THIRTEENTH CAUSE OF ACTION**
**AGAINST ALL DEFENDANTS**
*Violation of N.Y. Labor Law, § 195(5)*

433.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

434.    New York employers are required to provide written vacation or PTO policies and therefore should clearly set forth in writing their philosophy in respect to unused vacation under N.Y. Labor Law § 195(5).

435.    Under New York law, in the absence of a forfeiture clause in an employer's written policy, accrued and unused vacation must be paid to employees upon termination.

436.    GFG and KJD employed Ms. Thomas.

437.    The Huebscher Defendants were agents of the new GFG.

438.    The New York City Human Rights Law applies to employers and their agents.

439.    The Defendants never provided Ms. Thomas with its written vacation or PTO policies and therefore should clearly set forth in writing their philosophy in respect to unused vacation as required by N.*Y. Labor Law §195(5).*

440.    Defendants violated the above and Plaintiff suffered numerous damages as a result.

## AS AND FOR A FOURTEENTH CAUSE OF ACTION
## AGAINST ALL DEFENDANTS
*Violation of N.Y. Labor Law, § 195(6)*

441.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

442.    Under *N.Y. Labor Law §195(6)*, employers are required to provide discharged employees with written notice stating the effective date of termination and the exact date that any employee benefits, including health, accident, and life insurance, will cease.

443.    Under *N.Y. Labor Law §195(6)*, GFG was required to issue this written termination notice no later than five days after the date of termination by law. *N.Y. Labor Law § 195(6).*

444.    Under *N.Y. Labor Law §195(6),* failure to notify an employee of cancellation of accident or health insurance subjects an employer to an additional penalty pursuant to section two hundred seventeen of New York's labor law.

445.    GFG and KJD employed Ms. Thomas.

446.    The Huebscher Defendants were agents of the new GFG.

447.    The New York City Human Rights Law and Title VII law applies to employers and their agents.

448.    The Defendants never provided Ms. Thomas with a written termination notice outlining the dates that her employee benefits would terminate within the requisite five days.

449.    Defendants violated the above and Plaintiff suffered numerous damages as a result.

## AS AND FOR A FIFTEENTH CAUSE OF ACTION
## AGAINST ALL DEFENDANTS
*Violation of 12 N.Y.C.R.R. § 472.8*

450.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

451.    *12 N.Y.C.R.R. §472.8* requires all employers to provide notice, at the time of separation, of the employee's right to file an application for unemployment benefits to be provided on Form IA 12.3.

452.    GFG and KJD employed Ms. Thomas.

453.    The Huebscher Defendants were agents of the new GFG.

454.    The New York City Human Rights Law and Title VII law applies to employers ***and*** their agents.

455.    In violation of *12 N.Y.C.R.R. § 472.8*, the Defendants never provided Ms. Thomas with notice, at the time of her termination, of her right to file an application for unemployment benefits to be provided on Form IA 12.3.

456.    Defendants violated the above and Plaintiff suffered numerous damages as a result.

<div align="center">

**AS AND FOR A SIXTEENTH CAUSE OF ACTION
AGAINST ALL DEFENDANTS**
*Breach of Contract*

</div>

457.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

458.    Ms. Thomas' employment letter from GFG constituted an agreement.

459.    Ms. Thomas' employment offer letter states, "Global Fertility & Genetics reserves the right to terminate the employment of any employee for just cause at any time without notice and without payment in lieu of notice. Global Fertility & Genetics will be entitled to terminate your employment for any reason other than for just cause, upon providing to you such minimum notice of 30 days as required by law." *See* Ex. E, Ms. Thomas' Employment Offer Letter.

460.    Ms. Thomas was terminated from GFG on February 7, 2025 without just cause. As a result, the Defendants breached the termination provision of its contract with Ms. Thomas.

461.    Defendants violated the above and Plaintiff suffered numerous damages as a result.

## AS AND FOR A SEVENTEENTH CAUSE OF ACTION
## AGAINST ALL DEFENDANTS
### *Intentional Infliction of Emotional Distress*

462.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

463.    In the face of Dr. Thornton's repeated abuse of the proper procedures and protocols of the medical profession, Ms. Thomas had a duty to hold Dr. Thornton accountable.

464.    The Defendant's purposeful decision to retaliate against Ms. Thomas by terminating her for reporting Dr. Thornton's unlawful behavior was outrageous and reckless.

465.    The Defendants knew or should have known that their decision to retaliate against Ms. Thomas in the midst of having to battle a toxic work environment on top of her deep distress regarding the health of her loved ones by terminating her would adversely impact Ms. Thomas's mental health and cause her severe distress.

466.    GFG's toxic work environment also took a toll on Ms. Thomas' physical as she found herself constantly in pain later to learn that her fibroids metastasized rapidly—likely due to stress.

467.    Further, having to pay for her medical procedure out of pocket due to the abrupt termination of her medical insurance adversely impact Ms. Thomas's physical and mental health and caused her severe distress.

468.    As GFG's agents, the Huebscher Defendants and GFG intentionally and recklessly violated New York law in refusing to provide her with a termination letter, failing to provide her notice of her right to file an application for unemployment benefits, failing to inform Ms. Thomas of the cancellation of her benefits, and assisting in the early termination of her insurance benefits

in refusing to ensure that they were reinstated after having been informed that she lost insurance access.

469.    The Huebscher Defendants knew or should have known that their intentional decision to both advise and aid GFG in Ms. Thomas' wrongful termination as a mere act of retaliation for Ms. Thomas' decision to report Dr. Thornton as a result of his attempts to pressure her to violate her training as an Embryologist would adversely impact Ms. Thomas's mental health and cause her severe distress.

470.    Plaintiff suffered numerous damages as a direct result of the Defendants aforementioned decisions.

## AS AND FOR AN EIGHTEENTH CAUSE OF ACTION
## AGAINST ALL DEFENDANTS
### *Negligent Infliction of Emotional Distress*

471.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

472.    In the face of Dr. Thornton's repeated abuse of the proper procedures and protocols of the medical profession, Ms. Thomas had a duty to hold Dr. Thornton accountable.

473.    The Defendant's purposeful decision to retaliate against Ms. Thomas by terminating her for reporting Dr. Thornton's unlawful behavior was negligent.

474.    The Defendants knew or should have known that their decision to retaliate against Ms. Thomas in the midst of having to battle a toxic work environment on top of her deep distress regarding the health of her loved ones by terminating her would adversely impact Ms. Thomas's mental health and cause her severe distress.

475.    GFG's toxic work environment also took a toll on Ms. Thomas' physical as she found herself constantly in pain later to learn that her fibroids metastasized rapidly—likely due to stress.

476.    Further, having to pay for her medical procedure out of pocket due to the abrupt termination of her medical insurance adversely impact Ms. Thomas's physical and mental health and caused her severe distress.

477.    As GFG's agents, the Huebscher Defendants and GFG violated New York law in refusing to provide her with a termination letter, failing to provide her notice of her right to file an application for unemployment benefits, failing to inform Ms. Thomas of the cancellation of her benefits, and assisting in the early termination of her insurance benefits in refusing to ensure that they were reinstated after having been informed that she lost insurance access.

478.    The Huebscher Defendants knew or should have known that their decision to both advise and aid GFG in Ms. Thomas' wrongful termination as a mere act of retaliation for Ms. Thomas' decision to report Dr. Thornton as a result of his attempts to pressure her to violate her training as an Embryologist would adversely impact Ms. Thomas's mental health and cause her severe distress.

479.    Plaintiff suffered numerous damages as a result of the Defendants negligent and/or reckless actions.

### AS AND FOR A NINETEENTH CAUSE OF ACTION
### AGAINST ALL DEFENDANTS
*Defamation*

480.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

481.    Plaintiff was called a "dark cloud" because of her insistence on maintaing the proper safety standards for the sake of patient care.

482.    Upon information and belief, Defendants published formal and this informal false negative criticisms about Ms. Thomas and her job performance through email, text, or other written transmission.

483.    Upon information and belief, these negative criticisms were published to numerous third-parties without authorization.

484.    The Defendants were at the very least negligent when they made the false statements.

485.    As a result of Defendants' negligent and/or reckless actions, Plaintiff has sustained actual damages.

<div align="center">

**AS AND FOR A TWENTIETH CAUSE OF ACTION
AGAINST ALL DEFENDANTS**
*Conversion*

</div>

486.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

487.    Ms. Thomas had a right to be paid for the employment services that she performed while at GFG.

488.    GFG deducted money from each of Ms. Thomas' paycheck for her health insurance premium.

489.    GFG maliciously and prematurely terminated Ms. Thomas' health insurance on February 7, 2025.

490.    Even after terminating Ms. Thomas' health insurance on February 7, 2025, GFG still deducted money from Ms. Thomas' paycheck issued on February 19, 2025.

491.    As a result of these insurance payments, Ms. Thomas was entitled to insurance coverage.

492.    GFG wrongfully exercised dominion over the funds from Ms. Thomas' paycheck.

493.    GFG's decision to both deduct money from Ms. Thomas' paychecks for health insurance and to terminate her health insurance constitutes conversion.

494.    The Huebscher Defendants were aware of GFG and KJD's conversion when Ms. Thomas notified Mr. Huebscher that the money was withdrawn from her paycheck and requested that her insurance be instated.

495.    As GFG and KJD's agent, the Huebscher Defendants are also liable for the conversion of Ms. Thomas' income since the Huebscher Defendants assisted in GFG and KJD's early termination of Ms. Thomas' insurance benefits by refusing to ensure that Ms. Thomas' insurance benefits were reinstated.

496.    As a result of Defendants' negligent and/or reckless actions, Plaintiff has sustained actual damages.

<div align="center">

**AS AND FOR A TWENTY-FIRST CAUSE OF ACTION**
**AGAINST GLOBAL FERTILITY AND GENETICS, INC. AND KJD MEDICAL, PLLC**
*Fraud or Misrepresentation*

</div>

497.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

498.    GFG represented that it would guarantee Ms. Thomas a $10,000 raise after her initial 90 days of work.

499.    Ms. Thomas reasonably relied on this representation when she decided to leave her place of employment prior to GFG.

500.    GFG failed to grant Ms. Thomas a raise after her initial 90 day probationary period.

501.    GFG only granted Ms. Thomas $10,000 two months after the date that she was supposed to receive the raise.

502.    GFG also represented that it would grant Ms. Thomas insurance coverage 30 days after employment.

503.    Ms. Thomas reasonably relied on this representation when she decided to leave her place of employment prior to GFG.

504.    Upon information and belief, GFG made these false representations knowingly and recklessly.

505.    GFG only granted Ms. Thomas insurance coverage 90 days after her employment instead of the promised 30 days.

506.    Upon information and belief, GFG intended to defraud Ms. Thomas when it guaranteed that she would receive insurance coverage after 30 days of her employment and a raise after 90 days of employment.

507.    As a result of Defendants' negligent and/or reckless actions, Plaintiff has sustained actual damages.

## AS AND FOR A TWENTY-SECOND CAUSE OF ACTION
## AGAINST GLOBAL FERTILITY AND GENETICS, INC. AND KJD MEDICAL, PLLC
### *Negligent Misrepresentation*

508.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

509.    GFG represented that it would guarantee Ms. Thomas a $10,000 raise after her initial 90 days of work.

510.    Ms. Thomas reasonably relied on this representation when she decided to leave her place of employment prior to GFG.

511.    GFG failed to grant Ms. Thomas a raise after her initial 90 day probationary period.

512.    GFG only granted Ms. Thomas $10,000 two months after the date that she was supposed to receive the raise.

513.    GFG also represented that it would grant Ms. Thomas insurance coverage 30 days after employment.

514.    Ms. Thomas reasonably relied on this representation when she decided to leave her place of employment prior to GFG.

515.    GFG only granted Ms. Thomas insurance coverage 90 days after her employment instead of the promised 30 days.

516.    The information that that GFG provided Ms. Thomas was incorrect.

517.    As a result of Defendants' negligent and/or reckless actions, Plaintiff has sustained actual damages.

### AS AND FOR A TWENTY THIRD CAUSE OF ACTION
### AGAINST THE HUEBSCHER DEFENDANTS
*Tortious Interference with a Contract*

518.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

519.    During Mr. Huebscher's tenure as the old GFG's Bankruptcy Trustee, Mr. Huebscher was entitled to qualified immunity; however, Mr. Huebscher as Bankruptcy Trustee could always be held personally liable for knowing, intentional and/or negligent breaches of his fiduciary duties.

520.    During these February and March exchanges with Ms. Thomas, the Huebscher Defendants were no longer court appointed trustees, but rather they were agents of the new GFG.

521.    As agents of the new GFG, the Huebscher Defendants actively participated in GFG's governance including discussing matters that exceeded the scope of the Huebscher Defendants duties as Bankruptcy Trustee and the trustee's financial advisor.

522.    Once Ms. Thomas signed her employment contract with GFG, Ms. Thomas had a valid contract with GFG.

523.    As former Bankruptcy Trustee and GFG's agent, the Huebscher Defendants had knowledge were at all times aware that Ms. Thomas had a valid employment contract with GFG.

524.    Ms. Thomas' employment letter states, "Global Fertility & Genetics reserves the right to terminate the employment of any employee for just cause at any time without notice and without payment in lieu of notice. Global Fertility & Genetics will be entitled to terminate your employment for any reason other than for just cause, upon providing to you such minimum notice of 30 days as required by law." *See* Ex. E, Ms. Thomas' Employment Offer Letter.

525.    Upon information and belief, the Huebscher Defendants intentionally procured GFG's breach of its employment contract when the Huebscher Defendants both advised and aided and abetted GFG in the decision to fire Ms. Thomas without just cause.

526.    There was an actual breach of contract when GFG terminated Ms. Thomas without just cause.

527.    Further, as a result of GFG's employment contract with Ms. Thomas, under New York Law in the event of employee termination, GFG was required provide Ms. Thomas with a termination letter, a notice of her right to file an application for unemployment benefits, and notice of the cancellation of her benefits.

528.    The Huebscher Defendants willfully intervened in Ms. Thomas' correspondence with GFG to manage the handling of Ms. Thomas' termination, namely the termination letter and information about the cancellation of her benefits.

529.    Ms. Thomas insisted that she was owed a termination letter and also insisted on being given information about her insurance post-termination; however, the Huebscher Defendants refused to provide her with a termination letter and/or refused to insist that GFG provide her with a termination letter. The Huebscher Defendants also refused to ensure the reinstatement of Ms. Thomas' insurance benefits and/or refused to ensure that GFG reinstated Ms. Thomas' insurance benefits.

530.    As GFG's agents, the Huebscher Defendants and GFG violated New York law in refusing to provide her with a termination letter, failing to provide her notice of her right to file an application for unemployment benefits, failing to inform Ms. Thomas of the cancellation of her benefits, and assisting in the early termination of her insurance benefits in refusing to ensure that they were reinstated after having been informed that she lost insurance access.

531.    As a result of Defendants' negligent and/or reckless actions, Plaintiff sustained actual damages.

### AS AND FOR A TWENTY FOURTH CAUSE OF ACTION AGAINST THE HUEBSCHER DEFENDANTS
*Tortious Interference with a Business Relationship*

532.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

533.    During Mr. Huebscher's tenure as the old GFG's Bankruptcy Trustee, Mr. Huebscher was entitled to qualified immunity; however, Mr. Huebscher as Bankruptcy Trustee

could always be held personally liable for knowing, intentional and/or negligent breaches of his fiduciary duties.

534.    During these February and March exchanges with Ms. Thomas, the Huebscher Defendants were no longer court appointed trustees, but rather they were agents of the new GFG.

535.    As agents of the new GFG, the Huebscher Defendants actively participated in GFG's governance including discussing matters that exceeded the scope of the Huebscher Defendants duties as Bankruptcy Trustee and the trustee's financial advisor.

536.    Once Ms. Thomas signed her employment contract with GFG, Ms. Thomas had a business relationship with GFG.

537.    As former Bankruptcy Trustee and GFG's agent, the Huebscher Defendants had knowledge were at all times aware that Ms. Thomas had a business relationship with GFG and intentionally interfered with said business relationship.

538.    Ms. Thomas' employment letter states, "Global Fertility & Genetics reserves the right to terminate the employment of any employee for just cause at any time without notice and without payment in lieu of notice. Global Fertility & Genetics will be entitled to terminate your employment for any reason other than for just cause, upon providing to you such minimum notice of 30 days as required by law." *See* Ex. E, Ms. Thomas' Employment Offer Letter.

539.    Upon information and belief, the Huebscher Defendants intentionally interfered with Ms. Thomas' business relationship when it procured GFG's breach of its employment contract through advising and aiding and abetting GFG in the decision to wrongfully terminate Ms. Thomas without just cause as an act of retaliation for refusing to violate her training as an Embryologist and reporting Dr. Thornton to require that she violate her professional training.

540.    The Huebscher Defendants intervention was solely out of malice to retaliate against Ms. Thomas for standing up for herself in refusing to violate her professional training.

541.    Further, as a result of GFG's employment contract with Ms. Thomas, under New York Law in the event of employee termination, GFG was required provide Ms. Thomas with a termination letter, a notice of her right to file an application for unemployment benefits, and notice of the cancellation of her benefits.

542.    The Huebscher Defendants willfully intervened in Ms. Thomas' correspondence with GFG to manage the handling of Ms. Thomas' termination, namely the termination letter and information about the cancellation of her benefits.

543.    Ms. Thomas insisted that she was owed a termination letter and also insisted on being given information about her insurance post-termination.

544.    However, the Huebscher Defendants acted solely out of malice in refusing to provide her with a termination letter and/or refused to insist that GFG provide her with a termination letter.

545.    The Huebscher Defendants also acting solely out of malice, unfairly refused to ensure the reinstatement of Ms. Thomas' insurance benefits and/or refused to ensure that GFG reinstated Ms. Thomas' insurance benefits.

546.    As GFG's agents, the Huebscher Defendants and GFG acted solely out of malice to further retaliate against Ms. Thomas by violating New York law in refusing to provide her with a termination letter, failing to provide her notice of her right to file an application for unemployment benefits, failing to inform Ms. Thomas of the cancellation of her benefits, and assisting in the early termination of her insurance benefits in refusing to ensure that they were reinstated after having been informed that she lost insurance access.

547.    As a result of Defendants' reckless and malicious actions, Plaintiff sustained actual damages.

## AS AND FOR A TWENTY FIFTH CAUSE OF ACTION
## AGAINST THE HUEBSCHER DEFENDANTS
### *Breach of Fiduciary Duties*

548.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

549.    During Mr. Huebscher's tenure as the old GFG's Bankruptcy Trustee, Mr. Huebscher was entitled to qualified immunity; however, Mr. Huebscher as Bankruptcy Trustee could always be held personally liable for knowing, intentional and/or negligent breaches of his fiduciary duties.

550.    During these February and March exchanges with Ms. Thomas, the Huebscher Defendants were no longer court appointed trustees, but rather they were agents of the new GFG.

551.    Under New York law, agents have fiduciary duties. Here, a fiduciary relationship existed between the Huebscher Defendants and GFG, including GFG's employees.

552.    As GFG's agents, the Huebscher Defendants knowingly breached its fiduciary duties of care and good faith to GFG (and Ms. Thomas by extension) by violating New York law in refusing to provide her with a termination letter, failing to provide her notice of her right to file an application for unemployment benefits, failing to inform Ms. Thomas of the cancellation of her benefits, and assisting in the early termination of her insurance benefits in refusing to ensure that they were reinstated after having been informed that she lost insurance access.

553.    The Huebscher Defendants' actions were intentional, reckless, and arose from malice to retaliate against Ms. Thomas for refusing to dishonor her Professional training as an Embryologist.

554.    As a result of Defendants' reckless and malicious actions, Plaintiff sustained actual damages directly resulting from the Huebscher Defendant's misconduct.

## JURY DEMAND

555.    Plaintiff hereby demands a jury trial.

**WHEREFORE**, Plaintiff respectfully requests a judgment against the Defendant:

A.  Declaring that Defendants engaged in unlawful employment practices prohibited by Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act**,** New York State Human Rights Law, and the New York City Administrative Code, in that Defendants retaliated against Plaintiff due to her complaining of a hostile work environment;

B.  Awarding damages to Plaintiff for all benefits resulting from Defendants' unlawful retaliation, and conduct and to otherwise make Plaintiff whole for any losses suffered because of such unlawful employment practices;

C.  Awarding Plaintiff compensatory damages for mental and emotional injury, distress, pain, suffering, and injury to Plaintiff's reputation in an amount to be proven;

D.  Awarding Plaintiff damages for damages which such employment entails;

E.  Awarding Plaintiff punitive damages;

F.  Awarding Plaintiff liquidated damages;

G.  Awarding Plaintiff prejudgment interest;

H.  Awarding Plaintiff's Attorney's Costs and Fees associated with this litigation.

DATED:  September 23, 2025.

Respectfully submitted,
/s/ Omobolaji Oluwasola, Esq._____

Omobolaji Oluwasola, Esq.
108 W 39th Street

Ste 1006
New York, NY 10018
omobolaji@oluwasola.com
(443) 257-3910

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CHARLYN THOMAS,                                             Index No.

                                    Plaintiff,

            vs.
                                                          **INDIVIDUAL VERIFICATION**

GLOBAL FERTILITY AND GENETICS, INC.,
GLOBAL FERTILITY AND GENETICS NEW YORK
LLC., KJD MEDICAL, PLLC,
DR. MELVIN THORNTON,  HUEBSCHER AND CO.,
and ERIC HUEBSCHER.

                                    Defendants.

## VERIFICATION

I, Charlyn Thomas, verify that the statements contained in the foregoing are true and correct to the best of my knowledge, information and belief.  I declare under penalty of perjury that the foregoing is true and correct.


                                    /s/ Charlyn Thomas
                                    Charlyn Thomas

DATED:    September 23, 2025

## <u>VERIFICATION OF COUNSEL</u>

I, Omobolaji Oluwasola, Esquire, hereby verify that I have investigated the statements contained in the foregoing are true and correct to the best of her knowledge, information and belief. I also verify that this lawsuit is not brought with frivolous purposes to harass or intimidate.

Dated: September 23, 2025

<div style="margin-left:50%">

Respectfully submitted,
/s/ Omobolaji Oluwasola, Esq._____

Omobolaji Oluwasola, Esq.
108 W 39th Street
Ste 1006
New York, NY 10018
omobolaji@oluwasola.com
(443) 257-3910

*Counsel for Plaintiff*

</div>